CHARLES LEONARD and BURR BURTON, Respondents, *v.* THE NEW YORK, ALBANY AND BUFFALO ELECTRO MAGNETIC TELEGRAPH COMPANY.

The plaintiffs, manufacturers of salt at S., had an agent at Chicago and another at Oswego, the shipping port for their salt. Their agent at Chicago, telegraphed their agent at O., to send 5,000 *sacks* of salt to Chicago immediately. The defendant, a telegraph company, over whose line the telegram came, and who delivered it to the plaintiffs' agent at O., by the carelessness of their servant, wrote *casks* for " *sacks.*" Fine salt is put up in sacks of fourteen pounds each ; coarse salt, in casks of 320 pounds each. The agent at O., having informed the plaintiffs of the order, and received their permission to fill it, shipped, on a vessel at O. bound for Chicago, the 5,000 casks of coarse salt ; and it was put on board, and shipping bills signed, before the plaintiffs, or their agent at O., learned that there was any mistake. The agent at O., at the time he learned of a mistake, knew that the vessel had been cleared, and supposed she had left the port ; but, she did not, in fact, leave until the following morning.

On the arrival of the salt at Chicago, there was no market for it, and it was stored by the plaintiffs' agents at their expense, and was finally sold, at less than the market price, at O.

In an action, by the plaintiffs, to recover damages of the defendant, arising from their mistake in delivering the telegram,—*Held* (GROVER, J., contra), that the difference between the market value of the salt at O., and what it sold for at Chicago, together with the expense of transportation from O. to Chicago, was not an improper measure of damages.

*Held*, further, that the omission of the plaintiffs' agent at O., when he learned the mistake, to attempt a stoppage of the vessel, then in port, and thus to prevent a great part of the loss, was not legal negligence, and did not impair the plaintiffs' right of recovery.

The expense of transportation to Chicago from O., being proved, and nothing appearing as to what would be the cost of transportation back again, after its arrival there, the plaintiffs will not be held bound to have returned it to O. again, although the difference in the market price at the two cities, was greater than the whole cost of the outward transportation.

The liability of telegraph companies transmitting messages discussed.

(Cause submitted in 1868 ; a re-argument then ordered ; re-argued in 1869, and second re-argument ordered ; and again argued January 15th, 1870, and decided March 24th, 1870.)

APPEAL from the judgment of the General Term of the Supreme Court in the fifth judicial district, affirming a judgment for the plaintiff.

The defendants in 1856, owned and operated a line of telegraph between Buffalo and New York, connecting at Buffalo with the line of the Western Union Telegraph Company to Chicago, and at Syracuse with a line to Oswego.

The plaintiffs, at the same time, were manufacturers of, and dealers in salt, at Syracuse, and had agents, Magill & Pickering, at Chicago, and D. B. Staats was their agent at Oswego for shipping and disposing of their salt at that place. Magill & Pickering had authority to order salt from Staats for sale at Chicago.

On the 24th of September, 1856, Magill & Pickering, acting for plaintiffs, delivered to the Western Union Company at Chicago, a dispatch to be sent to Staats at Oswego, as follows:

" D. B. STAATS, Oswego :

" Send 5,000 sacks of salt immediately.
                                    " MAGILL & PICKERING."

And they paid the usual charges for transmitting said dispatch to Oswego. The dispatch was sent by the Western Union Company to Buffalo, and there it was delivered to the agent of the defendants. It was transmitted by the defendants over their line to Syracuse ; and in transcribing it at this point for the purpose of delivery to the Oswego line, the agent of defendants negligently wrote the word " casks " in place of " sacks," so that when the message was delivered to the Oswego line, and by that line to Staats, it read as follows:

" D. B. STAATS, Oswego :

" Send 5,000 casks of salt immediately.
                                    " MAGILL & PICKERING."

The term " sacks " in the salt trade designates fine salt in sacks containing fourteen pounds, and the term " casks " designates coarse salt in packages containing not less than 320 pounds.

Staats received the telegram on the afternoon of September 24th, 1856, and that evening or the next morning, chartered the schooner " S. H. Lathrop," to take the salt to Chicago, and shipped by her 2,733$\frac{200}{320}$ barrels of coarse salt

As soon as said Staats received this dispatch on the 24th day of September, he sent a telegram from Oswego to plaintiffs at Salina as follows :

" Shall I ship Magill & Pickering 5,000 casks ? Just received order."

On the 25th September, plaintiffs' answered Staats by telegram, as follows :

" You may ship Magill & Pickering the 5,000."

The last mentioned dispatch was received by said Staats on the 25th of September, and on the same day, he sent to plaintiffs the following telegram :

" Ship along immediately ; fleet in, Magill & Pickering telegraphed, send us 5,000 casks salt immediately ; I suppose coarse,"

The plaintiffs received said last mentioned dispatch on the 25th September. On the 26th of September, plaintiffs sent a telegram from Salina to Magill & Pickering at Chicago, as follows :

" What kind of salt do you want ? Coarse or fine ? Answer."

On the same day Magill & Pickering answered the plaintiffs at Salina as follows :

" Three-quarters fine ; balance coarse." Plaintiffs immediately, on same day, sent a telegram to Staats at Oswego as follows :   " Magill & Pickering's order is three-quarters fine ; balance coarse."

This dispatch was not received by said Staats until after the vessel had loaded the salt in question and the bill of lading had been signed and delivered to the master of the vessel and he had received his clearance from the port of Oswego. Between the morning of the 24th of September and the night of the 26th of September, no communication passed between either Staats and plaintiffs or Staats and Magill & Pickering, or between plaintiffs and Magill & Pickering, except as above stated. The last mentioned dispatch was received by Staats in the afternoon of the 26th of September.

At the time he received it, he knew the vessel had finished loading, and supposed she had actually left the Oswego harbor, as vessels at that season usually hurried their departure; but it does not appear that he made any effort whatever, to ascertain or inform himself of the fact as to whether she had actually sailed or was then within the Oswego harbor. She actually sailed the next day, the 27th of September, but not before five o'clock in the morning.

On the 29th day of September, Magill & Pickering sent a telegram to Staats, as follows: "Did you ship us any bag salt last week? Send five thousand more now." On the 30th September, Staats replied as follows:

"Have shipped no bags; will by next vessel." On the 2d of October Magill & Pickering sent the following telegram to Staats:

"Asked you to send 5,000 bags, not casks; don't send any more."

This dispatch was sent on notice being received by Magill & Pickering of the shipment of the salt by the *Lathrop*.

The plaintiffs did not know, at the time of the shipment of the salt in question, the condition of the market in Chicago for coarse salt, or the value of such salt at that place.

The cargo of salt arrived at Chicago on the 15th day of October. There was no market for the same at Chicago, and Magill & Pickering stored the same at the expense of the plaintiffs until 1857, when it was sold for less than one dollar per barrel. The salt was worth at the time of its shipment, in Oswego, $1.60 per barrel. The cost of transporting the same to Chicago, exclusive of insurance, was nearly $27\frac{1}{2}$ cents per barrel, and on its arrival at Chicago it was not worth at that place to exceed $1.25 per barrel.

The cause was tried before a referee who found the foregoing facts. He also found that there was no negligence on the part of the plaintiffs or of Staats in shipping the salt in question, or in acting upon the order of Magill & Pickering of the 24th of September, and decided as questions of law "that the failure of Staats to inquire or ascertain whether the vessel

containing the salt in question had actually left the Oswego harbor at the time he received plaintiff's dispatch of the 26th of September, or to make any effort to stay the shipment of said salt does not constitute such negligence on the part of the plaintiffs or their agent Staats, as will relieve defendants from liability in the premises." Also, "that the measure of damages to which the said plaintiffs are entitled is the difference in the value of the salt at Oswego and Chicago, with the costs of transportation added thereto, with interest from the time of the arrival of said salt at Chicago."

From the judgment entered upon the report of the referee, the defendant appealed to the General Term, and from judgment of affirmance at General Term, to this court.

The cause was submitted in June, 1868; a re-argument was ordered in September of the same year, and it was re-argued in March, 1869; and the court being again divided, another re-argument was ordered, which took place at the January term, 1870.

*Grosvenor P. Lowrey*, for the appellants.

### I. As to the Rule of Damages.

*The rule of damages adopted by the referee, is erroneous, so far as it includes any loss by change in market price, or interest, or loss by sale, or any other loss, than the expense of sending the salt to Chicago.*

It will be seen that the defendants are willing to pay for the freight on 1,250 casks to Chicago, being, at twenty-seven and a half cents per barrel, $392.85.

The reasons for distinguishing this portion of the damage claimed from the remainder are:

*First.* Nothing is lawfully recoverable under the facts found, except *moneys actually disbursed for freight.*

*Second.* Only so much of those moneys *ought* to be recovered as could not, by diligence on the part of plaintiff's agent, have been saved.

The second reason will be considered under the point relating to the plaintiff's negligence.

This case is one of those which are continually arising to show that the rule of damages in cases not involving fraud can never be considered settled

Argument of Counsel for Appellant.

for all cases. When one party is a fraudulent wrong-doer, and the other the victim, the rule of justice is easy to find, and when found it is the law. But where the question is the distribution of losses or responsibilities between innocent parties, neither of whom has committed intentional fault, and one of whom has had but a temporary and incidental relation to, or charge of the matters out of which the loss arises, the question of law becomes a high question of morals, and demands the best consideration of judges in their capacity of arbiters of right, as well as dispensers of technical law. For to make one bear the loss of another, unless by his willful wrong-doing he has caused and thus incurred the loss, or, *by contracting and being paid to bear the loss,* he has voluntarily and *knowingly assumed it,* is spoliation.

Accordingly, it has been the effort of jurisprudence, both in the continental codes and the later judicial determinations of England and America, to find a rule which should do justice between parties thus situated.

It is said in Domat's Civil Law, by Strahan, section 1977: "As we have remarked, in the matter touching the interest of money, the several views by which we may judge if any interest be due or not, so we ought also to discern, in questions which arise about damages, whether any be due or not. And this depends on the quality of the act which may have given rise to the damage; if it is an accident, a slight fault, an imprudence, a crime, an involuntary non-performance of an engagement, or some other cause."

And again, in treating of the duty of the judge in estimating damages, section 1972: "It follows that, as the questions relating to damages arise always from the acts, which vary according to the circumstances, it is by the prudence of the judge that they are to be decided; he, joining to the light which the principles of law and equity may give him, a prudent discernment of the circumstances, and of the regard which ought to be had of them; whether it be by lessening the damages which are to be adjudged, by cutting off *pretentions from distant losses,* if there be ground for it, as in cases where no bad design nor any fault can be imputed to the person who is to make good the damage."

These extracts sufficiently indicate the effort which is constantly made, under the civil law (by intrusting to the judge large discretion, and requiring him to investigate both the motive of the defendant, and the remoteness or immediateness of the damages suffered), to apportion the loss between the parties, so as not to visit upon the defendant, in gross, all damage which may have happened, but only that which is *directly* chargeable to his act, or which he has, by his contract, *undertaken to bear.* (Sedgwick on Damages, page 37.)

And this spirit and policy of law being applied by our more accurate common lawyers to the cases of breach of contract (which is the light in which, for the purposes of the argument, we are now regarding this case) has resulted in various attempts to establish a rule sufficiently broad and flexible to serve the purposes of justice in most cases. The result of long discussions will be found most intelligently and fully stated in *Hadley* v. *Baxen-*

dale (9 Exchq., 341); Griffin v. Colver (16 N. Y., 494); British Columbia, &c., Co. y. Nettleton (Law Rep. 3, Common Pleas, 399, 408).

From these three cases it is believed that the precise rule of damages for this case may be obtained.

As stated in Griffin v. Colver, the rule is laid down that "the damage recoverable is only such as may fairly be supposed to have entered into the contemplation of the parties when they made the contract; that is, such as might naturally be expected to follow its breach."

In every case that necessary "contemplation" of the damage likely to happen from a breach must be of a character to justify the court in implying a further term of the contract, to pay for the damage when it happens. It may perhaps be called a contractual contemplation or foresight of the damage. Thus, in the case of the British Columbia Co. v. Nettleton, WILLES, J., says: "I am disposed to take the narrow view that one of two contractors ought not to be allowed to obtain an advantage which he has not paid for. The conclusion at which we are invited to arrive would fix upon the ship owner, beyond the value of the thing lost and the freight, the further liability to account to the intended mill owners, in the event of a part of the machinery not arriving at all, or arriving too late, through accident or his default, for the full profits they might have made by the use of the mill, if the trade were successful or without a rival. If that had been presented to the mind of the ship owner at the time of making the contract, as the basis upon which he was contracting, he would at once have rejected it. And, though he knew from the mill owners the use they intended to make of the articles, it could not be contended that the mere fact of knowledge, without more, would be a reason for imposing upon him a greater liability than would otherwise have been cast upon him. To my mind that leads to the inevitable conclusion that the fact of knowledge cannot increase the liability. The knowledge must be brought home to the party, and ought to be charged under such circumstances that he must know that the person he contracts with reasonably believes that he accepts the contract with the special condition attached to it."

This element of contracting with reference to the contemplated damages must, in justice, exist in every case of damages resulting from breach of contract. In cases like Griffin v. Colver, it is more easily implied; but in cases like the one in hand, or like the English case last cited, there is the difficulty, first, of implying as against the mere carrier or telegrapher the requisite knowledge to enable the court to see that he must have foreseen the damage; and second, that having foreseen, or being able to foresee it, he contracted with reference to it.

The application of the rule to this case makes it necessary again to consider what was the contract. Whatever it was is to be ascertained from what took place at Chicago. Nothing took place there except the delivery of the dispatch and payment for its transmission. If the court will dismiss from mind all that has been brought out since then, and regard the dispatch as the sole evidence of a contract, and will stand just where the Western

Union Company and the plaintiffs did when the business came to their hands, of what does this dispatch inform an intelligent reader? Only that a firm in Chicago directs a man in Oswego to "*send* 5,000 casks of salt immediately." There is nothing to indicate whether this is a purchase; or a direction by an owner to his agent; or by an agent desiring to have goods on hand for sale; or desiring goods to meet a contract of sale. In short, there is nothing to indicate that it will make any difference to any person whether the price of salt is high or low when it shall arrive; or that any or what use is to be made of the salt in Chicago; or that it is to be sent to that place even. Such a message might very well be a cypher message, its real purport being entirely unlike its apparent purport. If the telegrapher is bound to draw inferences, it would doubtless be a fair inference that the sending was to be from the place to which the message is sent to that from which it is sent, although that might easily be a mistaken inference. But it is insisted that persons exercising for strangers a *special duty* so remote from the real business in hand, are not called upon to draw inferences. If the employer of the telegrapher wishes to hold him for damages he ought to inform him of the value of his message, and of the *nature* and *extent* of the damages likely to ensue from any error. If he wishes the telegrapher to assume the whole responsibility for whatever in the chapter of accidents may happen, he must himself go the whole length of informing the telegrapher of everything which a prudent man would wish to know when called upon to determine whether for a certain premium he will incur a certain risk. It may be that he will decline the employment altogether, or guard himself by taking special measures for which extra compensation will be demanded. In this case we were notified of a *sending*, but not of a *selling* of salt. Even if we were bound to take notice that freight charges and expenses would attend a sending, we certainly were not bound to see, and could not see that any loss by sale or change in value might ensue. An unexplained telegraph message is like a package of concealed value, and responsibility to an unlimited amount might be assumed in ignorance and without adequate consideration, if the doctrine on which the decisions below are based prevails.

In this case the *averment* is that the defendants contracted to inform the plaintiffs that they were required to "SEND" 5,000 *sacks* of salt. The *breach* alleged is that we informed them that they were required to "SEND" 5,000 *casks*. The *damage* claimed is the difference between the market value in Oswego and Chicago, in addition to the expense of transportation between those places.

It would seem to appear clearly, from a consideration of the character of the message itself, and of what takes place ordinarily on the deposit of a message to be sent (and nothing further or different is shown to have occurred in this case), that the application of the first part of the test rule laid down in *Griffin* v. *Colver* fails. In other words, that the damages allowed by the referee, at least so far as they include interest, loss of profits, or change in market prices, cannot "*be fairly supposed to have entered into*

*the contemplation of the parties at the time when they made the contract.*"
(*Hamlin* v. *G. A. R. Co.*, 1 H. & N., 408 ; *Lane* v. *Montreal Telegraph Co.*, 7
U. Canada R. C. P., 23 ; *Stevens* v. *Id.*, 16 U. C. Rep., 530 ; *Kinghorne* v. *Id.*,
18 U. C. Rep., 60 ; *Lansberger* v. *Mag. Tel. Co.*, 32 Barb., 530 ; *U. S. Tel.
Co.* v. *Gildersleeve*, 29 Maryland Rep., 233.)

In a suit by a broker against a telegraph company, to recover the dam-
ages resulting from the failure to transmit a dispatch containing the follow-
ing order " *sell fifty* (50) *gold,*" it was proved that the dispatch would be
understood among brokers to mean $50,000 of gold, but it was not shown
that the company's agents so understood it.  The court, after citing the
rule as stated in *Griffin* v. *Colver*, said :

"And believing it to be obviously just and reasonable, we take it to be
the true rule upon the subject; and applying it to this case, the prayer
of the appellee, which was granted, is clearly incorrect.  For, while it
was proved that the dispatch in question would be understood among
brokers to mean $50,000 of gold, it was not shown, nor was it put to
the jury to find, that the appellant's agents so understood it, or whether
they understood it at all.  " Sell fifty gold " may have been understood
in its literal import, if it can be properly said to have any, or was as
likely to be taken to mean fifty dollars as $50,000, by those not initiated.
And if the measure of responsibility at all depends upon a knowledge of
the special circumstances of the case, it would certainly follow that the
nature of this dispatch should have been communicated to the agent at the
time it was offered to be sent, in order that the appellant might have
observed the precautions necessary to guard itself against the risk.  But
without reference to the fact as to whether the appellant had knowledge
of the true meaning and character of the dispatch, and thus enabled to
contemplate the consequences of a breach of the contract, the jury were
instructed that the appellee was entitled to recover to the full extent of his
loss by the decline in gold.  " In thus instructing the jury we think the court
committed error, and that its ruling should be reversed." (*U. S. Tel. Co.*
v. *Gildersleeve*, 29 Maryland.)

In the case at bar the damage largely resulted from the bringing *coarse*
salt into a market where it was not required.  " *Casks* " is understood in
the salt trade to mean " coarse," and " *sacks* " to mean " fine " salt.  But
this distinction is not understood among telegraphers, and there was no
way in which they could know that the substitution of " casks " for
" sacks " would result in the substitution of a large quantity of coarse salt
(not wanted) for a small quantity of fine salt (which was wanted).

It was the duty of the parties in Chicago to have given us such informa-
tion as would have enabled us to see the extent of the risk which we incur-
red, and to take such special precautions to guard ourselves as the extent
of the risk required.

In *Landsberger* v. *Magnetic Tel. Co.*, the message was, " get $10,000 of the
Mail Company."  The $10,000 was in the hands of the company and
destined by the person corresponding for a certain use.  The message was

addressed to " Landsberger " and was received and written out to " Lammeyer;" some delay resulted from this error, and in consequence a chance to use the money to a profit was lost. The court said : " The defendants were not informed of any special use intended to be made of this sum of money ; and what damage could they *naturally* expect to follow· from the delay in the receipt of it ? Clearly the loss of the use of that sum during the time that its receipt was delayed, and the damage for the loss of such use, are, by the laws of New York, determined to be the interest on the money," &c.

There was in the case cited as much reason for saying that the telegraph company was bound to know that pecuniary damage beyond interest would happen, because he knew that the dispatch related to money, which is the sole agent of commercial transactions, as there is for plaintiff's counsel to say, as they do at page seven of their points, that the damage by sale at a low market price of this salt must be deemed to have been contemplated, because the dispatch referred to the " transfer of a marketable commodity."

It is also clear from the premises that the damages above referred to are not such as might be *naturally expected to follow a violation of this contract,* even if the contract be construed to be an absolute engagement to transmit correctly at all hazards.

The damages happening from change in market price ; from loss of profits by reason of change in market price, and interest on the loss thus sustained, are not the natural and legitimate consequences of *our default.*

*The proximate cause of the loss was the sale at a low price.* But we neither caused the depreciated price or *enforced the sale.* The damages would appear to be not merely remote but entirely inconsequent on anything done by us. The case is even not so strong as if we had delayed a communication, so that a party failed to get his goods to a certain place in time to avail himself of a high market; or so strong as the ordinary case of failure by a common carrier to deliver goods in time for sale in a high market, in which latter case the carrier has been held not to be liable. (*Weibert* v. *N. Y. and R. R.*, 19 Barb., 36 ; *Jones* v. *Same*, 29 Barb., 633 ; 3 Parsons Con., 5th ed., 180.)

In such cases the question is whether one cause in a chain of causes is remote or proximate. But here the mistake is *in no sense a cause of the cause* of damage. The relation of the cause to the effect is the same as would exist where a carrier of passengers should fail to keep his contract, and put his passenger down short of his journey in the city where an epidemic was raging, from which the passenger should suffer; or where he should be unable to obtain something required by his particular state of health. There is nothing to show a failure to reach Chicago in time to get a good market; nor was the party by any misinformation induced *to sell at a low market.* He took goods from a market in which they bore the higher price, to one in which, at the time of arrival (October 15th), they bore the lower price ; and, having found the state of the market, and being free to sell, retain or return them, *he chose to sell them there.*

In order to escape the effects of the rule as laid down in *Hadley* v. *Baxendale*, and *Griffin* v. *Colver*, counsel for respondent appear to have invented a refinement or extension of the prevailing rule of damages, which is expressed on page nine of their points, as follows:

"In the case at bar, the damages sustained by the plaintiffs were not within the contemplation of the parties, when the contract to send the telegram was made, in the sense that they were considered by the parties, for the reason that no such *breach* or *default* by the defendants as that which occurred *could have been foreseen.*"

Thus it appears to be argued that, under a binding and authoritative decision (*Griffin* v. *Colver*), that a party is not liable for unforeseen damages, he may be held liable if the failure to foresee was the result, not of want of attention or intelligence, but of an *absolute impossibility of foreseeing.* The plaintiff's cause of action is based upon an implied contract to pay damages caused by us. The law limits this implied contract to those damages which we ought to have foreseen, and are therefore treated as having in fact foreseen. The plaintiff now prefers a claim which he says we did not foresee, and he gives a reason for the failure to foresee, which doubtless he regards as an equivalent. But whatever may be the reason, if we did not in fact or in presumption of law foresee the damages, then we have never promised to pay them. This doctrine annuls the well considered limitations of *Griffin* v. *Colver.*

They have also cited a number of common carriers' cases, which are claimed to be applicable.

It will not be necessary to examine these cases in detail, for they may be easily classified, and the difference between the class to which they belong and this case shown.

A carrier who receives marketable goods for transportation, and who delays unwarrantably their delivery, has been held in some States to be liable for damages, measured by comparing the market value of the goods at the time when they should, with that at the time when they did, arrive. It is well understood that the Court of Appeals has not declared this to be the law of New York. (*Cutting* v. *Grand Trunk Railway Co.*, 13 All., 389.)

The cases of *Squires* v. *Western Union Co.*, and *Wenger* v. *U. S. Tel. Co.*, cited by plaintiff's counsel, differed from the case at bar in the essential particular which we are discussing. In each of those cases the dispatches referred to commercial transactions of bargain and sale. Damages resulting from change in market value, by which, and delay in the message, the party in one case was obliged to pay a higher price for his goods, and in the other failed to obtain the higher price, were clearly the *natural result* of the telegrapher's failure, and must be deemed to have been contemplated by him. The telegraph cases reported in 1 Daly, cited for plaintiff, are all in this court for review, where it is believed that the doctrines conclusively set forth by DALY, F. J., dissenting, will be sustained and the judgments reversed.

Those cases are not, therefore, authority for this case; and those first

named are to be read also in connection with the case of *Gildersleeve* v. *U. S. Tel. Co.*, cited above.

With this explanation it is believed that the principle of cases like *Cutting* v. *Grand Trunk Railway Co.*, can easily be distinguished from this by some very brief suggestions, assuming for the argument that the doctrine of the last case prevailed in this State.

1. The carrier receives my marketable goods at New York, to be transported to Buffalo. He knows (because he is the agent chosen to effect it) that I do not want them in New York, but do want them in Buffalo, for sale or for some other use, from which I hope to derive some profit or advantage. If he improperly delays bringing them to Buffalo, and in the meantime their value in the market depreciates, he has prevented me from realizing the profit or advantage which he was bound, by his knowledge of affairs, to know that I contemplated. He has prevented me from enjoying an advantage which I certainly should have enjoyed but for his default, and brought upon me an unavoidable loss of that opportunity for profit. The damage would seem to be the natural, that is, the immediate and otherwise uninfluenced result of his act.

This is an instance of those carriers' cases in which the comparison of market values of the thing carried has furnished the measure of damages.

2. Let us now suppose a case precisely analogous to the present one.

I am possessed, in New York, of a valuable picture, having a market value among the connoisseurs and wealthy men of that city of $2,000. I receive a letter from a man in Buffalo, who says: "Bring on your picture, I have an offer of $3,000 for it;" and I go with it to that city at a cost of twenty-five dollars. On arriving, I ascertain it to be untrue that that or any offer has been made. I learn, also, that in that city works of art of that character are not esteemed, and that the best offer I can get is $500. I can return with it or sell it there.

*If I do sell it, can it be pretended that the measure of my damage is the difference between the value in New York ($2,000), and the price obtained ($500)?*

*Is it not clear that the true measure of my damage is the loss of time and the expense of going and coming?*

*Or, if I choose to avail myself of the journey to make a sale at a price which I am willing to accept, is it not clear that I have parted with my claim to compensation for the journey?*

In the case at bar, there is no evidence whatever of change of price in Oswego; and, upon the case as presented, it is clear that had the plaintiffs shipped their goods immediately back from Chicago, and received reimbursement for their outlay, and compensation for their time, they would have been completely indemnified.

There is no evidence of the cost of reshipping; nor is conjecture on that subject admissible. They decided to keep their salt there, and sell it for the best price they could get.

They, therefore, adopted the venture, and took their chance of loss and profit.

The defendants have, however, expressed their willingness to reimburse the expense of carriage, and do not propose to make any argument against their liability for that item of damage upon 1,142 casks.

It will be seen that there are four classes of cases to which the rule in *Griffin* v. *Colver* is applied.

1. Carriers' cases, in which the thing carried is a marketable commodity, concerning which a use, liable to be affected by change in market value, is deemed to have been contemplated by both parties.

These cases are represented by *Cutting* v. *Grand Trunk Railway Co* (which cannot be admitted to be authority in New York), and *Medbury* v *The N. Y. and Erie R. R. Co.*, cited by plaintiff's counsel.

2. Telegraph cases, where the employment of the telegraph appears upon its face to relate to transactions of bargain and sale.

These cases are somewhat analogous to the cases of the first class, subject to the qualification expressed in the *U. S. Tel. Co.* v. *Gildersleeve* (as to the extent and amount of damage). Damages resulting from change in market value are clearly the natural result of the default, and are thus deemed to have entered into the contract between the bailee and his employer.

3. Carriers' cases, where the thing carried is not marketable, and in which the damage has ensued, not from a change in its value, but in the loss of opportunity to make profitable use of it.

To this class belong *Griffin* v. *Colver*, *Hadley* v. *Baxendale*, *The British, &c., Co.* v. *Nettleton*, and numerous others. In these cases the application of the rule becomes more difficult, and requires a discriminating judgment.

4. Telegraph and other cases of bailment, where the employment did not ostensibly relate to, or appear to be in aid of any transaction in which the market value of the thing in question was of importance.

To this class of cases, most nearly related to those of the third class, belong *Landsberger* v. *The Magnetic Co.* and the present case. Referring to such cases, WILLES, J., in *The British, &c., Co.* v. *Nettleton*, said: " Cases of this sort have always been found difficult to deal with. Beginning with a case said to have been decided about two centuries and a half ago, where a man going to marry an heiress, his horse having cast a shoe upon the journey, employed a blacksmith to replace it, who did the work so unskillfully that the horse was lamed, and the rider not arriving in time the lady married another, and the blacksmith was held liable for the loss of the marriage."

II. " The law, for wise reasons, imposes upon a party subjected to injury by breach of contract, the *active duty* of making reasonable exertions to render the injury as light as possible. Public interest and sound morality accord with the law in demanding this ; and if the injured party, through negligence or willfulness, allows the damage to be unnecessarily enhanced, the increased loss justly falls upon him."

(*Hamilton* v. *McPherson*, 28 N. Y., 76; *Milton* v. *The Hudson River Steamboat Co.*, 37 N. Y., 210, 214; *Rood* v. *The N. Y. and Erie R. R. Co.*, 88.)

"In assessing damages, the direct and immediate consequences of the injurious act are to be regarded, and not remote, speculative and contingent consequences, which the party injured might easily have avoided by his own act." (SHAW, Ch. J.—*Loker* v. *Damon*, 17 Pick., 284.)

NOTE.—There was no conflict of evidence as to any of the facts touching the conduct of plaintiffs' agent; the finding of the referee states those facts precisely as they were proved, and that finding now presents the question of negligence as a pure question of law for this court. (*Gonzales* v. *N. Y. and Harlem R. R. Co.*, 38 N. Y., 442.)

Upon each occasion when this court has considered this case, the question of negligence has been treated without objection, as fairly raised upon the record, except that, upon the first argument, one of the opinions indicates the doctrine that, in cases of breach of contract, the question of defendants' negligence does not arise. Upon this point the first two cases in this court, cited above, are authority.

The finding was, that the plaintiffs and Staats learned, on the 26th of September, of the mistake in the original dispatch; that the knowledge did not reach Staats until the vessel had finished loading, the bill of lading been delivered, and the vessel had obtained her clearance at the custom house.

That she did not sail until some time on the 27th, and that Staats made no effort to ascertain whether she had departed, or whether she could be stopped.

Upon this state of facts, as to the departure of the vessel, let us examine the relation of all the parties to this business.

1. The telegraph company, performing a special duty through its operators, and not through its contracting agents, had innocently made an error on the 25th, of which they were first informed by the bringing of this suit.

There was nothing which informed them of what was taking place in Oswego.

They were not informed of the discovery of an error; a notification which would have enabled them at Oswego to have taken some steps to protect the plaintiffs and themselves from any loss beyond what had been incurred.

They were not notified at Chicago of the arrival of the salt; no tender of the salt was made to them; they were in no way enabled to protect themselves.

2. The plaintiffs having received, doubtless, during business hours (they would have shown the contrary had this not been the fact), notice of the mistake, had also cleared their vessel during business hours, at the custom house. It can have been but a short time after the clearance that they learned of the error. In a place like Oswego, it could be the work of but a

few minutes to ascertain whether a vessel, whose recent whereabouts was known, had departed.

3. This vessel had not departed, nor did she do so until several hours afterward. During the time that she remained the portion of the salt which was then known not to be required might have been unladen.

4. But Staats "supposed" she had gone, and therefore made no effort to verify his supposition.

If Staats had sold these goods to Magill & Pickering, and under similar circumstances had learned of their insolvency, can it be for a moment doubted that he would have been *instant to find whether the goods were beyond his reach, and to stop them if they were not?*

Not to have been prompt and energetic under such circumstances would have been to withhold that care and vigilance which every prudent man of business gives to his affairs; and this lack of vigilance is to be explained only on one of two hypotheses; *first*, that he lacked that prudence which he must possess and employ in order to make his cause of action perfect; or *second*, that, being still under the impression that 1,250 casks of coarse salt were needed, and the vessel being needed to carry those, he thought it best to make the venture upon the remaining 1,142 casks.

The business of the plaintiffs was to sell salt, and they were naturally anxious to get rid of as large a portion of their production as possible. They seem to have been so ignorant of the markets of the country as not to have known that salt was lower in Chicago than at Oswego, or to have been surprised at receiving so large an order from the low market. It is entirely reasonable, therefore, to suppose that (with or without at the time contemplating recourse to the telegraph company) Mr. Staats may have thought it on the whole better to risk the 1,142 barrels, which, as the season was just opening, would, at the latest, soon be wanted in Chicago for consumption, than to delay the portion still supposed to be required, and incur the expense of unloading the other portion.

But plaintiffs' counsel urge that Staats *supposed* the vessel had sailed, and that the circumstances justified the supposition. Upon this asserted *justification* of the *supposition* rests solely the plaintiffs' defence to our charge that *their negligence intervened between our negligence and their injury*, and became the *operative cause of at least a portion of their loss.*

Now, what circumstances justified this supposition?

Not the fact; for the fact was not as was supposed.

Was it because the vessel had obtained her custom house papers (which is all that constitutes a clearance)?

Or was it because vessels, at that time of year, hurry their departure?

As for the first, it is well known to every business man that vessels often obtain their clearances days before sailing.

As for the second, it is well known that at all times of the year vessels hurry their departure when the cargo is in.

Either or both these facts justified the supposition that the vessel would depart for Chicago as soon as she conveniently could; but they did not

justify the supposition that she was gone almost as soon as her cargo was on board; nor did they justify at all the reliance upon *supposition* when *certainty* was so *easily attainable*.

No doubt the vessel followed the practice of vessels, as Staats knew it, to hurry to sea; and with her utmost hurry she did not, and probably could not get off until the next day, and this an ordinarily intelligent business man must have known.

Mr. Staat's supposition does not seem, therefore, to have been justified by any circumstance; and it is not doubted that if he had felt his own or his principal's interest involved, as it would have been in the case supposed above, of a discovery that the buyer of goods sold and laden had become insolvent, he would either not have entertained this supposition at all, or would not have placed the implicit reliance upon it which he claims to have done in this case.

It being already determined, as matter of fact, that Staats could have stopped the vessel if he had tried, it remains for this court to say whether, on all the facts, it was his duty to try. If it be adjudged that such was his duty, it then remains to determine how the facts would have been changed by his success.

In making the requisite computations, it must be observed that in the salt trade, "cask" means simply a certain amount or weight of coarse salt, and that in this case the amount of salt has been calculated in barrels, which contain a less quantity of the same kind of salt.

The freight and damage at Chicago has been calculated upon "barrels;" two thousand three hundred and ninety-two casks (2,392), equal to two thousand seven hundred and thirty-three 200–280 (2,733 200–280) barrels. (Tenth finding of fact.)

The judgment is composed of two items, exclusive of interest:

1. Freight on 2,733 20–28 bbls. at 27½c......................... $751 76
2. Loss on arrival " " at 35c............. ............ 956 80

$1,708 56

If Staats had acted diligently, and with prudence, he would have stopped the vessel, and might:

1. Have taken off the whole cargo, settling with the vessel on the best terms he could; as to what these terms might have been the case furnishes no evidence. The plaintiffs chose to take another course, and the defendants could not, therefore, produce conjectural evidence. While it is allowed that in such a case it would probably cost something to be permitted to withdraw freight, yet, as no figures are given, the court cannot fix upon any sum with which to hold the defendants chargeable, especially as they were not notified and permitted themselves to intervene, and either take the charter or settle with the ship.

2. He might and ought to have taken out 1,142 casks, which would have reduced the judgment by $358.91 for freight, and $456.80 loss at Chicago, amounting to $815.71, and leaving the judgment $892.85.

A further reduction of $500 loss at Chicago on 1,250 casks, would leave the judgment $392.85, being the freight on that number of casks.

There were circumstances in the case which led the defendants to urge upon the first and second argument that it was negligent in the plaintiffs not to have known, upon the receipt of the message of September 26th, that such a mistake had been made in that of the 24th, as required them to detain the whole shipment until the facts were ascertained. That view did not seem to be adopted by the court, and now, without abandoning it, it has been thought best not to press it upon the court, but to express our willingness to reimburse the freight upon 1,250 casks, which, perhaps, Staats was still warranted in supposing to be required.

In recapitulation, we claim:

1. That no damages, except actual disbursements for freight are, in their nature, the actual result of our error.

2. That part of the freight paid ought, and presumptively would have been saved, but for carelessness and want of prudence on the part of the plaintiffs' agent, and that for this part we are not liable.

3. That, in asserting such a cause of action against a defendant in the situation of the telegraph company, ignorant of its offence, denied any opportunity to come in at the time, and prevent, if it could, a part of the loss; kept ignorant of all the circumstances until the plaintiffs had tried their fortune and irrecoverably fixed their loss; it is incumbent upon the plaintiffs to show that they have been diligent, prudent and conscientious. · In our absence, and without our knowledge, they have fixed a loss which they ask us to pay; good morals require that if any part of this loss might have been averted by them, that part they should bear.

*Charles Andrews*, for the respondent.

*The rule of damages adopted by the referee, was favorable to the defendant, and was justified by the principles of law, applicable to the subject.*

The plaintiffs recovered nothing for speculative or contingent losses, but for *actual* loss only.

Nor were they allowed to recover any actual loss except what was incurred at the very time the salt reached Chicago.

The subsequent loss, by reason of the expenses for storage, and the depreciation in the value of the salt below the market price, on the 15th of October, 1856, which occurred before the salt could be sold, was disallowed, although it was nearly or quite equal in amount, to the damages given.

(1) The damages allowed were the natural and proximate consequence of the *wrong* committed by the defendant, and were such as would have been contemplated by the parties when the contract was made, if they had *foreseen* the nature of the delinquency, which afterward occurred.

The rule of damages upon breach of contract, which was declared in *Hadley* v. *Baxendale* (9 Exch., 340), and followed in *Griffin* v. *Colver* (16 N. Y., 489), is, in its true interpretation, consistent with the allowance in this case.

The undertaking of the defendant was, to transmit to the agent of the plaintiffs, at Oswego, an order to forward to their agent at Chicago, 5,000 *sacks* of salt.

The defendant was apprised upon reading the message, that it was sent to procure the transfer of a *marketable commodity*, from Oswego to Chicago.

The parties, in view of the law, contemplated such damages, from failure by the defendant to perform the contract, as would naturally result from such a breach, or such breaches of the contract, as could be *foreseen* by them.

The *breaches* which could be foreseen, were either an omission to send the telegram at all, or unreasonable delay in sending it, or an act in execution of the contract, which was yet an imperfect performance of it, *e. g.*, making the order greater or less than the real one.

If the default of the defendant has consisted of either of these things, and it had appeared that by change in *market value*, loss had been sustained by the plaintiff, this, with any additional expenses, in consequence of the default, would have been the measure of damages.

It would be analogous to the cause of a breach by a carrier of his contract to transport goods. (*Brackett* v. *McNair*, 14 Johns., 170; *Amory* v. *McGregor*, 15 Johns., 24; *O'Connor* v. *Forster*, 10 Watts, 418.)

Or where there was an unreasonable delay by the carriers, to transporting and delivering goods.

In such case, it must now be deemed settled, that the difference in market value, when they are delivered, and when they should have been, is the measure of damages. (*Kent* v. *Hudson R. R. R. Co.*, 22 Bar., 278; *Medbury* v. *The N. Y. and Erie R. R. Co.*, 26 Bar., 564; *Scoville* v. *Griffith*, 2 Ker., 509; *Scollard* v. *The Southeastern Railway Co.*, 7 H. & N., 79; *Wilson* v. *The Lancashire and Yorkshire Railway Co.*, 30 L. J. C. P. (N. S.), 232; *Ingledow* v. *Northern R. R. Co.*, 7 Gray, 86; *Sisson* v. *The Cleveland and Toledo R. R. Co.*, 14 Mich., 489.)

And this, although the goods were not intended to be used for any special purpose, or to be sold at any particular market. (*Cutting* v. *Grand Trunk Railway Co.*, 13 Allen, 381.)

This analogy has been followed in actions against telegraphic companies. (*Squires* v. *Western Union Telegraph Co.*, 98 Mass., 382; *Wenger* v. *United States Telegraph Co.*, 55 Penn., 262.)

These cases are illustrations of the proper application of the rule in *Hadley* v. *Baxendale*, and in *Griffin* v. *Colver*.

The damages allowed, are the natural result of the breach of the contract, and because they are so, the law adjudges that they were within the contemplation of the parties when it was made.

The nature of the subject, however, forbids the construction of any formula, which shall declare the rule of damages, for all cases.

In *Wilson* v. *The Newport Dock Co.* (1 Law R. Exch., 177), Baron MARTIN, referring to the case of *Hadley* v. *Baxendale*, says:

"Parties entering into contracts, contemplate that they will be performed and not broken, and in the infinite majority of instances, the damage to arise from the breach never enters into their contemplation."

In *Gee* v. *The Lancashire and Yorkshire Railway* (6 H. & N., 211), Baron WILDE, observed:

"This question as to the measure of damages, is one that has produced more difficulty than perhaps any branch of the law, and I rather agree with an observation by my brother Martin, that although a very excellent attempt was made in *Hadley* v. *Baxendale*, to lay down a rule of practice, it is found the rule will not meet all cases, and it will probably be found practically that when the matter comes to be more solemnly discussed, that in this as in many other cases of contract, there is no measure of damages at all, and that we are seeking to find a rule where a rule cannot be made."

In cases where the contract is to do, or to refrain from doing a particular thing, and the breach consists simply in doing, or in not doing the thing specified; there the resulting damages, for which the law allows a recovery are those, which being natural and to be expected, were within the *contemplation of the parties* when the contract was made.

In the case at bar, the damages sustained by the plaintiff were not within the contemplation of the parties, when the contract to send the telegram was made, in the sense that they were considered by the parties, for the reason that no such *breach* or *default* by the defendant, as that which occurred, could have been *foreseen*.

The damages were, however, the natural result of the *wrong* committed by the defendant, viz. : The substitution and delivery of an order for a different kind of salt from that described in the message, which the defendant undertook to transmit.

These damages were the proximate consequence of the injury

That there may have been an intervening human agency between the wrongful cause and injurious consequence, does not relieve the defendant from liability. The influence of the wrongful act continued to the final consequence. (*McDonald* v. *Snelling*, 14 Allen, 290 ; *Wilson* v. *The Newport Dock Co.*, 1 Law R., 177.)

The damages were certain in their character.

The law adjudges that the *market* value of goods is their *actual* value, and it adjusts losses when there has been a breach of a contract to deliver or to accept goods or to transport them, upon this consideration. (*Griffin* v. *Colver*, 16 N. Y., 488 ; *Cutting* v. *Grand Trunk R. Co.*, 13 Allen, 381.)

The damages sustained, being the natural and proximate consequence of the *mistake* made by the defendant, it must be held that the defendant contemplated the injury which was occasioned thereby.

Having thrown a loss upon the plaintiff, which was the natural consequence of his act, the defendant cannot escape upon the ground that the plaintiffs did not contemplate the injury when the contract was made.

The reason was, they did not and could not *foresee* the *act* from which the injury proceeded.

Damages, though not contemplated, if the natural result of a breach of contract, may be recovered. (*Cory* v. *Thames Iron Works Co.*, 3 Law R. Q. B. 1868, 181.)

2. The plaintiffs were not bound to return the salt from Chicago to Oswego; and it does not appear that such a course would have benefited either party.

(*a*) The defendant by his wrongful act, procured the transfer of the salt from Oswego to Chicago. The difference in the market price of the commodity at the two places, was the loss *actually* sustained.

(*b*) There is no proof that it could have been returned to Oswego, so that any part of the loss could have been prevented.

The freight to Chicago was twenty-seven cents a barrel. It is quite probable, in view of the season of the year and the course of trade, that the down freight, if the salt had been re-shipped, would have exceeded thirty-five cents a barrel, which was the sum allowed for the difference in market value between Oswego and Chicago.

(*c*) The plaintiffs were not bound to assume the risk, or to enter upon a *new enterprise*, to protect the defendant from loss.

Nor would the expenses of re-shipment and return freight have been legitimate items of damage.

The cases illustrating the principle, that where there has been a breach of contract by one party, due diligence must be used by the other party to avoid loss, show the proper limitations of the doctrine.

*e. g.*—Covenant to repair mill dam (2 Met., 615); contract to keep barns in repair, and injury to young cattle, by reason of failure to perform the contract (5 Den., 306); injury to crops from tearing down fences (17 Pick., 284); contract for carriage when another conveyance could be had (10 Watts, 418); contract for work and labor (2 Den., 609).

(*d*) The burden of proving that the damages sustained could have been diminished or prevented, rested upon the defendant, and no proof upon the subject was given. (*Costigan* v. *The Mohawk and H. R. R. Co.*, 2 Denio, 609 · *Hamilton* v. *McPherson*, 28 N. Y., 72.)

(*e*) The adjudications in cases similar to this, establish a rule of damages quite as favorable to the plaintiff as that adopted by the referee. (*Rittenhouse* v. *The Independent Tel. Co.*, 1 Daly, 475; *Bryant* v. *The American Tel. Co.*, 1 Daly, 576; *Parks* v. *Atl. Cal. Tel. Co.*, 13 Cal., 422; *De Rutte* v. *N. Y., Albany and Buff. Tel. Co.*, 1 Daly, 574; *N. Y. and Wash. Print. Tel. Co.* v. *Dryberg*, 35 Penn., 298; *Wenger* v. *U. S. Tel. Co.*, 55 Penn., 262.)

II. There was no negligence on the part of the plaintiffs in acting upon the order delivered to Staats, or in his shipping the salt, or in the fact that after the plaintiff's telegram of the 26th of September, was received by him, he did not seek and

detain the "Lathrop" and her cargo, before she left the Oswego harbor.

Upon the rule of law, that the question of negligence is a question of fact, and that the decision of the tribunal, whose province it is to determine the facts, is final in respect to them, and is not subject to review in this court, the finding of the learned and intelligent referee, in this case, upon the question of negligence, is conclusive.

The facts and the inferences from facts, are not open for consideration here, with a view to impeach the judgment. (*Ireland* v. *Oswego R. R.*, 3 Kerr., 533; *Ernst* v. *Hudson R. R. R.*, 36 N. Y., 533; *Keller* v. *New York Central R. R.*, 26 How., 117; *Bernhardt* v. *Rensselaer and Sar. R. R.*, 23 How., 169.)

Nor should the defendants, whose negligence is conceded, be discharged from liability for the damages sustained by the plaintiff, unless upon clear and satisfactory evidence of negligence on the part of the plaintiffs, which contributed to produce the injury. (*Clark* v. *Kerwin*, 4 E. D. Smith, 21; *Martin* v. *G. N. R. R. Co.*, 30 Eng. L. & Eq., 477.)

But the facts abundantly support the finding of the referee.

(1.) When the order from Magill & Pickering, of the 24th September was received, the plaintiff and their agent acted upon it without hesitation, and they entertained no doubt as to its authenticity.

To fill the order they procured from other parties, more than half the salt shipped.

(2.) The "Lathrop" was chartered on the 25th September, and on the 26th the lading was completed; the bill of lading was signed and delivered to the master and he procured his clearance from the port of Oswego.

(3.) The plaintiffs first learned on the 26th September, that there was a mistake in the order of Magill & Pickering.

They on the same day informed Staats, by telegraph, that the order was for "three-quarters fine; balance coarse."

(4.) This telegram was received by Staats, after the vessel had completed her loading, and after the bill of lading had been signed and delivered, and the clearance procured; and Staats *knew* these facts, and *supposed* that the vessel had left the harbor.

He also knew that vessels at that season hurried their departure.

In fact, however, the vessel did not sail until the 27th, and not earlier than five o'clock on the morning of that day.

The omission of Staats under these circumstances, to ascertain whether the vessel had in fact sailed, cannot be imputed as negligence, to the plaintiffs.

If in good faith he *supposed* the vessel had left the harbor, he was not called upon to prosecute the inquiry. The circumstances justified him in the supposition he entertained.

(5.) By the dispatch from Magill & Pickering, on the 26th September, the plaintiffs would have been justified in shipping them 1,300 barrels of

coarse salt, and if they had known that the " Lathrop " had not sailed, they had no information from which they could determine whether greater loss would be sustained by allowing the whole cargo to go, or by retaining the salt on payment of freight.

(6.) The facts conclusively confute the imputation, that the plaintiffs knowing of the mistake and that the vessel had not sailed, meant to take the hazard and call upon the defendant for damages in case the venture proved a losing one.

EARL, Ch. J.   The appellant seeks a reversal of this judgment, upon two grounds, and, unless we find its position right in reference to one or both of them, it is conceded that the judgment must be affirmed.

1st. It claims, that the plaintiffs' agent, Staats, was guilty of negligence in not stopping and unloading the vessel, after he received plaintiffs' dispatch of the 26th of September, and thus avoiding most of the damage, which plaintiffs sustained. Before this dispatch was received, the loading of the vessel was completed, the bill of lading was signed and delivered to the master, and he had procured his clearance from the port of Oswego.   Staats knew these facts, and knew, also, that it was usual for vessels, at that season of the year, to hurry their departure.   Relying upon these facts, and supposing the vessel had actually sailed, he made no effort to detain her. From all this, the referee found, that there was no negligence on the part of Staats, and I see no good reason for disturbing his findings.   There were sufficient grounds for concluding, in good faith, that the vessel had sailed; the facts indicated that she had sailed, and I do not see how Staats could be charged with the want of ordinary diligence, in relying upon them.   The greatest degree of diligence would, doubtless, have required Staats to have made inquiries for the vessel, after he received the dispatch.   But, he was only bound to ordinary diligence, and I do not see how we can find the want of such a degree of diligence against the finding of the referee, and in favor of a party, who, upon this question, has the affirmative.   (*Hamilton* v. *McPherson*, 28 N. Y., 76; *Milton* v. *The Hudson River Steamboat Co.*, 37 N. Y., 210;

*Costigan* v. *The Mohawk & Hudson R. R. Co.*, 2 Denio, 609; *Dorwin* v. *Potter*, 5 Denio, 306; Shearman & Redfield on Negligence, § 598.)

But, aside from this, it is by no means certain that Staats could have obtained the salt from the vessel, if he had made the effort. He had made a valid contract to have the salt transported to Chicago, and the other party to the contract had taken possession of the salt, and entered upon the execution of the contract. What right had Staats to take the salt away from him? I know of no process of law, by which he could have done it. And what right did the defendants have to ask Staats to violate his contract with that third party, in order to shield it from the consequences of its own wrong. I am, therefore, clearly of the opinion, that the alleged negligence furnishes no defence to the action.

2d. It is also claimed, that the referee adopted an erroneous rule of damages, and that the plaintiffs should not, in any event, have recovered more than they actually disbursed for freight on the salt to Chicago. The measure of damages to be applied to cases as they arise, has been a fruitful subject of discussion in the courts. The difficulty is not so much in laying down general rules, as in applying them. The cardinal rule undoubtedly is, that the one party shall recover all the damages which has been occasioned by the breach of contract by the other party. But this rule is modified in its application by two others. The damages must flow directly and naturally from the breach of contract, and they must be certain, both in their nature and in respect to the cause from which they proceed. Under this latter rule, speculative, contingent and remote damages, which cannot be directly traced to the breach complained of, are excluded. Under the former rule, such damages are only allowed, as may fairly be supposed, to have entered into the contemplation of the parties when they made the contract, as might naturally be expected to follow its violation. It is not required, that the parties *must* have contemplated the actual damages, which are to be allowed. But the damages must be such, as the parties may

fairly be *supposed* to have contemplated, when they made the contract.   Parties entering into contracts, usually contemplate that they will be performed, and not that they will be violated. They very rarely actually contemplate any damages, which would flow from any breach, and very frequently have not sufficient information to know what such damages would be. As both parties are usually equally bound to know and be informed of the facts pertaining to the execution or breach of a contract, which they have entered into, I think, a more precise statement of this rule is, that a party is liable for all the direct damages, which both parties to the contract would have contemplated as flowing from its breach, if, at the time they entered into it, they had bestowed proper attention upon the subject, and had been fully informed of the facts.   In this case, then, in what may properly be called the fiction of law, the defendant must be presumed to have known that this dispatch was  an order for salt, as an article of merchandise, and that the plaintiff would fill the order as delivered ; and that, if the salt was shipped to Chicago, it would be shipped there as an article of merchandise, to be sold in the open market. And  the market price in Chicago being less than the market price in Oswego, that they would lose the cost of transportation, and the difference between the market price at Chicago and the market price at Oswego.   I think, therefore, that the rule of damages, adopted by the referee, was sufficiently favorable to the defendant.   The damages allowed were certain, and they were the proximate, direct result of the breach.

I do not think, under the facts of this case, that the plaintiffs, when they found the state of the Chicago market, were bound to re-ship this salt to Oswego.   For anything that appears in this case, the cost of transportation to Oswego would have been equal to the difference in the market price between the two places.   Then there was the risk of the lake transportation at that season of the year, and the uncertainty in the Oswego market, when the salt should again be landed there.   If the plaintiff had shipped it, and it had been lost upon the lake, the total loss would not have been chargeable

to the defendant. By the wrongful act of the defendant, the salt had been placed in Chicago, one of the largest commercial centers in the country, and the plaintiffs had the right to sell it there in good faith, and hold the defendant liable for the loss.

I have, therefore, reached the conclusion, that the judgment must be affirmed; and in reaching this conclusion, I believe I am sustained by principles well settled, and by adjudged cases quite analogous. (Sedgwick on Damages, 37; *Hadley* v. *Baxendale*, 9 Excheq., 341; *British Columbia &c. Co.* v. *Nettleton*, 3 Law Reports, Common Pleas, 399, 408; *Wilson* v. *The Newport Dock Co.*, 1 Law R., Excheq., 176; *Griffin* v. *Colver*, 16 N. Y., 489; *Hamilton* v. *McPherson*, 28 N. Y., 72; *Kent* v. *Hudson R. R. Co.*, 22 Barb., 278; *Medbury* v. *The N. Y. & Erie R. R. Co.*, 26 Barb., 564; *Scoville* v. *Griffith*, 2 Kern., 509; *Cutting* v. *Grand Trunk R. R. Co.*, 13 Allen, 381; *Squires* v. *Western Union Telegraph Co.*, 98 Mass., 382; *Wenger* v. *United States Telegraph*, 55 Penn., 262; *N. Y. & Washington Tel. Co.* v. *Dryburgh*, 35 Penn., 298; *Williams* v. *Barton*, 13 Louisiana R., 494.)

Judgment affirmed with costs.

HUNT, J. As the findings of fact by a referee, when not disturbed by the General Term, are conclusive upon this court, we are relieved from any critical examination of the testimony. Some of the important points do, indeed, arise upon undisputed facts, and thus present themselves as questions of law rather than as questions of fact. (Code, § 268; 5 Seld., 463.)

Of this character is the first point presented, to wit, whether Magill & Pickering were partners of the plaintiffs or were their agents. The referee, in fact and in law, adjudged them to be agents merely. Magill & Co. agreed to receive from the plaintiffs their salt, to sell it in the Chicago market, to render correct accounts of sales, and to remit the

proceeds every fifteen days. Their compensation for making the sales was to be one-half of the net profits, after deducting the cost of the salt, freight, insurance, dockage, and interest from the day of shipment to the day of sale. There was no agreement that they should bear any portion of the losses suffered. The hazard of loss rested upon the plaintiffs exclusively. This, in law, created an agency, and not a partnership. (*Salter* v. *Ham*, 31 N. Y. R., 321; *Burckle* v. *Eckhart*, 3 Coms., 132, S. C.; 1 Denio, 337.)

The dispatch in question was forwarded by the agents of the plaintiffs in their business, and has been adopted and assumed by them. The plaintiffs are the proper parties to bring this action.

The next and the main question is upon the liability of the defendants under the circumstances stated. The referee finds that, in fact and in law, the company receiving the message at Chicago was the agent of the New York company to receive messages for transmission over its wire. He finds this upon the contract, the substance of which is set forth in the preceding statement. He finds, also, that it had upon it a duty to receive and transmit correctly, and that it is liable upon that ground.

The plain and simple rule upon this branch of the case is furnished by the law upon the subject of common carriers. I do not consider a telegraph company subject to the liability of a common carrier, as I shall hereafter show, but I use the case as an illustration. A merchant in New York ships a bale of goods by the People's Line of steamboats from that city to Chicago. The duty of the people's line is not themselves to carry these goods to Chicago, but simply to carry them to the end of their route, and then deliver them according to instructions, or, if uninstructed, to some responsible line for further transportation. Their duty is then ended, as is their liability. (*Gould* v. *Chapin*, 20 N. Y. R., 259; *Ladue* v. *Griffith*, 25 id., 364; *McDonald* v. *W. T. Co.*, 34 N. Y. R., 497.) The railroad company, or the canal boat proprietor to whom they are delivered, upon their receipt, at

ance becomes liable to the shipper, and so remains until he carries the length of his route, and delivers them to some responsible party for further transportation. When this is done his liability ends, and that of the new carrier commences, upon the same terms. Each carrier, by the receipt of the goods, and the consequent promise to forward them, enters into an agreement with the owner at New York, although he does not meet him or correspond with him personally, that he will safely carry and deliver the goods, and is liable to the original owner in New York if he fails in his undertaking. (*Auth. sup*). The rule and the reason of it are the same in regard to the transmission of telegraphic messages.

A company of this character exists at Chicago, whose own lines extend only to Detroit or Toledo, and then connect with other lines extending to Buffalo; these, in their turn, with lines extending to New York, and connecting with the last line, and lines also extending northerly to Oswego and southerly to Binghamton. It is not the duty of the company thus situated at Chicago, on receiving a message for New York, nor does it undertake that it will, by itself or by its own lines, transmit the message to its final destination. In analogy to the common carriers' rule, and upon the good sense of the transaction and the general understanding of the community, it undertakes for care and attention in transmitting it over its own lines, and for its prompt delivery to a competent and responsible company for further transmission. When so delivered, its liability terminates, and that of the receiving company begins. On this point I hold the case to have been well decided by the referee, and if a liability existed, the defendant was the party upon whom, by law, it rested.

I have examined all the cases cited in the collection of decided cases, respecting telegraphic liabilities furnished by the appellants' counsel, and find that these views are sustained in principle by many of them, and not in hostility to any of them having authority. *Stevens* v. *Montreal Telegraph Company* (16 Upper Canada R., 530.)

The third objection presents the question, whether a telegraph company is liable as a common carrier, or whether their liability arises only in the want of proper care and attention.

I can find no authority, and can discover no principle upon which to charge such a company with the absolute liability of a common carrier. That liability was founded upon the necessities of the case, real or fancied, and has never been applied to any person or to any occupation, except those of carriers of goods and innkeepers. The carrier had the exclusive possession and control of the goods, often in secret, away from the supervision of any other person, with opportunity for embezzlement and collusion with evil minded persons, and without means of discovery by the owner. Especially was this so in the ruder stages of civilization, and before the present modes of communication, rapid and easy, were in existence. It was upon this view, early adopted as a rule of safety to the community, that the carrier should always be *prima facie* liable, in case of non-delivery of the goods, and that he should not be excused for any causes, except those occurring by the act of God or of the public enemies, and these were to be shown by himself.

Whether his liability is based upon the contract he makes, or upon his public duty, the telegrapher does not come within any of these principles. He has no property intrusted to his care. He has nothing which he can steal, or which can be taken from him. There is no subject of concealment or conspiracy. He has in his possession nothing which in its nature and of itself, is valuable. It is an idea, a thought, a sentiment, impalpable, invisible, not the subject of theft or sale, and as property, quite destitute of value. He cannot, himself, see or hear, or feel the subject of his charge. He submits an idea to a mysterious agency, which carries it to its destination, and delivers it to one there at hand to receive it. He is bound to conduct the business appertaining to this pursuit, with skill, with care and with attention. He holds himself out as possessing the ability to transmit these communications,

and he undertakes that he can and will transmit and deliver them with the expected dispatch. There may be circumstances in the nature of the instrumentality employed, and the effects to be produced, which, in a particular case, will prevent the proper accomplishment of the undertaking. A thunder storm, which prevents or renders dangerous the operation of electrical currents or machines; a tempest, which prostrates poles and breaks the wires; or unusual pressure of prior business; the sudden sickness of an operator, or many other causes, might prove a sufficient excuse for the want of a prompt delivery of a message. A message is taken to an office in Buffalo to be sent to the city of New York, a distance of about 500 miles, and is accepted. This acceptance implies that the message is to be sent immediately, or certainly within a few hours. The sender can communicate by letter or go in person, within the space of twelve or fourteen hours, and the object of a telegraphic message is to gain the advantage over the time that would thus elapse. This is understood by all parties, and the sender has the right to rely upon it.

In the present case the referee has found actual negligence or want of care in the defendants' agent at Syracuse. The message, as received at Syracuse from the west, contained an order for 5,000 sacks of salt, a sack containing about fourteen pounds of fine salt. As sent by the defendants' agent, it contained an order for the same number of casks of salt—a cask containing 320 pounds of coarse salt. No excuse is given for this error, and no explanation, unless it be only that the characters by which these words are designated, nearly resemble each other. No doubt this would furnish a reason why a person ignorant of telegraphic characters or unskilled in their reading, should misunderstand them. Such are not the persons that the defendants are permitted to employ in this business. Those engaged in it profess to understand the hieroglyphics. They have, themselves, invented or adapted them. They are bound, also, to use the machinery which will in the best and safest manner deliver to them the expected

messages. Careless reading or ignorant management of the machinery is no excuse; it is simply an aggravation of the offence. The negligence was quite enough to justify the action.

The rule of damages adopted by the referee was the most favorable to the defendants of any that could have been applied, unless it should have been held that no recovery could be had beyond the price paid for the message. He gave the difference in the value of the salt at Oswego, on the day of its shipment, and its value in Chicago on the same day, together with the expense of transportation. Nothing was allowed for profits that might have been made on the fine salt ordered, or on the salt at Oswego, if it had not been sent, and no question of a falling market is in the case. The value of the salt at Oswego, where it would have remained except for the erroneous message, as compared with its value at Chicago, where the same error caused it to be sent, with the expense of so sending it, was the smallest allowance that could have been made. The case shows that the salt was actually sold in Chicago at a much greater loss, and that the plaintiffs were at an expense of several hundred dollars in storing the salt at Chicago. These items were not allowed. (*Griffin* v. *Colver* 16 N. R. R., 489; *Blot* v. *Boiceau*, 3 Coms., 78; *Watkinson* v. *Laughton*, 8 Johnson, 213; *Amory* v. *McGregor*, 15 Johns. R., 24; *Richmond* v. *Bronson*, 5 Denio, 55.)

If this is a question of contract, the point of the plaintiffs' negligence does not properly arise.

The breach of a contract by one party is not justified by the subsequent negligence of the other party. It can only be important on the question of damages. In actions of tort, where the plaintiff claims for the negligence of another, if he himself has been negligent, and thus contributed to his own injury, he can recover no damages; in every aspect of this point, the decision of the referee, implied in his finding, that there was no negligence on the part of the agent at Oswego, is conclusive. It might or it might not have been in his power to stop the sailing of the vessel on the 27th. It might

or might not have cost less to stop it than to allow it to go on. We do not understand the rules regulating this subject, or their effect, as well as did the agent at Oswego, or as did the referee. We must rest upon the decision of this latter.

Judgment should be affirmed, with costs.

Lott, J. The counsel for the appellants, in his points, waives all the points raised by the case except the following:

1st. Whether the plaintiffs were negligent and contributed to their own injury.

2d. Assuming that they were not, and that every other point requisite to sustain their cause of action be in their favor, what would be the proper rule and measure of damages in this case?

They will be briefly considered.

1st. Upon the facts found by the referee, the plaintiffs were authorized to ship the salt ordered to be sent by the telegram delivered to them. I see nothing in the case which can properly charge them with improper conduct in proceeding to execute the order. Nor is there, in my opinion, anything to warrant the conclusion that they were chargeable with negligence in not stopping the vessel on board of which the salt had been put, and requiring a return thereof.

The referee has found affirmatively that when the dispatch of September 26, 1856, from the plaintiffs to Staats, their agent, apprising him of the mistake in the order of Magill & Pickering, was received, he knew said vessel had finished loading, and supposed she had actually left the Oswego harbor. He also finds, it is true, that it did not appear that he made any effort whatsoever to ascertain or inform himself of the fact as to whether she had actually sailed or was then within the Oswego harbor. The omission of such effort did not constitute negligence. Knowing that the vessel was loaded, and believing that she had left port, and without any fact shown to raise a doubt as to the fact of her having sailed, why should he go on an errand or make an inquiry inconsistent with such belief? I certainly cannot see any rule or princi-

ple imposing on him that duty or obligation, and consequently there can be no imputation of negligence for omitting to do an act which he was not bound to perform.

2d. After a careful consideration of the question of damages, I have come to the conclusion that the rule adopted by the referee was correct, or at least as favorable to the defendants as can, upon any principle, be claimed by them. He has not charged them with any damages resulting from the non-fulfillment of the order, as actually given, to "send five thousand SACKS of salt immediately," but he has held them responsible only for the loss that has resulted from the order actually given to the plaintiffs' agent, that directed them "to send five thousand *casks*" instead of sacks of salt; that induced them to ship the salt which was sent and to incur the expense of the transportation thereof; and when it reached where it was ordered to be sent, it was not worth as much in the market there as its value at the port from which it came. If the order had not been given that expense would not have been incurred, and the loss resulting from such difference would not have been sustained. They are, therefore, the direct and immediate consequence or result of the defendant's act, and with those only, and the interest thereon, have they been charged.

It is insisted, and it may be the fact, that if the salt had been sent back from Chicago to Oswego, the loss to the plaintiff would have been less than the difference in value at those places. I am, however, unable to find any authority in the plaintiffs to return it, much less any duty or obligation to do so. Such return would have been attended with the cost of transportation and the charges incidental thereto, and those would not have been justified by the order; that was fully executed when the salt reached its place of destination in pursuance thereof; and there is no ground for saying that anything done after its full execution was done in compliance with its terms and direction. It necessarily follows that the expense incurred thereby would not have been a direct or necessary result or consequence of the defendant's act.

These views lead us to the conclusion that the referee did not err in his decision on either of the two questions now presented for our review, and that the judgment appealed from should be affirmed, with costs.

All the judges concurring for affirmance, except Grover, J., who thought the rule of damages erroneous.

Judgment affirmed.

Note.—On the argument at the March Term, 1869, Hunt and Lott, JJ., delivered the opinions above reported, and to which they adhered on this argument.

Woodruff, and Daniels, JJ., then delivered opinions in favor of reversal, which I have thought proper to give below in this note, as this is a pioneer case on the direct question of the liability of telegraph companies, in this State in a court of last resort.

The following are the opinions referred to:

Woodruff, J. The following is a brief memorandum of the result of my examination of this case:

1. The defendants are not common carriers. They are not intrusted as such. Their obligation rests in their undertaking, for a reward, to render a peculiar service; and they were bound to be, at least, reasonably diligent and careful to avoid errors and mistakes.

2. The Western Telegraph Company, in transmitting the message to the defendants to be forwarded, were either agents of the party sending the message or agents of the defendants to receive and forward messages to them to be further forwarded; or that company and the defendants were acting jointly in the reception of such message. In either case, if liable to any one, they are liable to the party furnishing the message.

3. It is expressly found as a fact that Magill & Pickering had authority to send the dispatch for, and as agents of the plaintiff; though I might doubt this, if the facts were open to inquiry here. The finding of facts by the referee is conclusive upon us. It would seem to me that they acted on their own behalf in giving the order, and for the purpose of earning *their* share of the proceeds of sale, and that they would have no right to charge the cost of the dispatch to the plaintiffs.

4. The defendants would not be liable for errors or imperfections arising from causes not within their control, *i. e.*, failure of the electrical current, irregularities in its power or efficiency, interruptions or confusions arising from storm and wind, heat or cold; nor for imperfections in the working of the wire arising from necessary imperfection or inherent characteristics in the metals or other things necessarily pertaining to the business of communicating by telegraph, or the machinery or appliances invented and approved for the purpose.

The defendants would perform their duty by putting in operation, for the

benefit of the sender, the facilities which this new art affords, with all the liabilities of failure or inaccuracy which belong to the science in its present stage of development, or result from causes otherwise beyond human control.

5. But the error was not shown to be the result of any such cause. It was not proved that the message, as received at Syracuse, was not perfectly legible. No evidence was given that any failure in the working of the wire, or any imperfection in the operation of the machinery occurred; nor even that the failure was due to any human infirmity or liability to error or mistake, except that a series of telepraphic signs, which imported in the telegraphic system "sacks" was made by the defendant's agent "casks."

The facts found do not show that the argument submitted was sustained by proof. It is not found that there was any difficulty in reading the signs actually delivered from the machine. It is not found that in the experience already had in the new art there is any difficulty in attaining accuracy in reading the signs invented to represent letters or words; nor that agents and employees do not, in fact, acquire the requisite skill. It is not found that the science of telegraphing, marvelous as it is in its results, is yet so imperfect that, by reasonable care, a message actually recorded truly may not invariably be truly transcribed. I could readily concede that, were it found that this invention and its record are still so imperfect that there is a necessary liability to uncertainty in the meaning of the signs produced by the electrical current, and that care and prudence are not adequate to guard against it, the company might not be liable for error in reading them; as for example, if no set of signs had yet been invented which the electricity would transmit, and which could be translated into words without necessary liability to error, it might be said with great plausibility, at least, if the company and its agents are careful and diligent to read correctly, they are not liable for such errors as occur in spite thereof. Here is a dispatch, in signs not found to be illegible; not found to be in any degree unintelligible to one of ordinary skill in the art; not shown to have been imperfect from any causes liable to affect unfavorably the delicate and somewhat uncertain process which this new science involves; not shown, in short, not to have been in all respects such that an agent of ordinary skill, paying ordinary attention to his business, would have transcribed it truly. Such a dispatch is wrongly interpreted and forwarded. I perceive but one alternative; the error was due either to want of ordinary skill in the agent, or to negligence in his attention to his duty.

In the absence of such proofs as are above suggested, this seems to me the necessary inference, not because negligence is presumed, but because, under such circumstances, the conclusion of negligence or want of skill follows from the premises.

6. The damages recoverable are the direct and immediate consequences of the error. The consequences are precisely what would naturally ensue from the delivery of the message; they are precisely what the parties would expect.

But what are the damages directly flowing from the mistake? The

defendants, by the negligence of their agents, have caused the plaintiffs to send salt to Chicago, which, but for that negligence, would have remained in Oswego, where it could be sold to better advantage.

There is at least plausibility in the argument that the defendants should not be charged with any greater damages than were necessarily incurred, viz., the expense of the sending and the cost of returning the goods to Oswego.

This would reinstate the plaintiffs in their former position, and be a complete indemnity. In general, the interest of all parties would justify a sale in Chicago; but in this case the price was so low that the plantiffs acted at their peril.

The defendants ought not to suffer because the plaintiffs did not choose to return the goods to Oswego.

7. Finally, I agree with MULLIN, J., in the court below, that the plaintiffs, on getting information that the order was for only one-fourth coarse salt, should have used, at least, ordinary care to prevent the sending more than that to Chicago. Slight diligence to prevent the consequences of the mistake would have prevented a considerable loss. Had Staats made any effort, he might presumptively have taken out the excess over the one-fourth (1,250 casks); to wit, 1,142 casks. Upon these he might have been required to pay something to the owner of the vessel—perhaps full freight. That will depend upon the legal effect of the charter party, expenses, &c. But there would, in such case, be no other expense of returning them to their previous condition. As to the 1,250 casks, the expense of transporting them to Chicago and back would have been chargeable, because the plaintiffs had no reason to believe that, to that extent, the order was not according to the intent of the Chicago agents.

In this view there should be a new trial.

DANIELS, J. By the report of the referee it appears that, in the salt trade, at the time of the transaction in controversy, the term "sack" was known and used to designate a package of fine salt of about fourteen pounds, and the term "cask" to designate a package of coarse salt of about 320 pounds. The plaintiff's agent, Staats, acting upon the supposition that the dispatch of September 24, 1856, correctly contained the order of Magill & Pickering, loaded upon a vessel for them, at Oswego, 2,392 casks of coarse salt, which was equal in quantity to 2,733 barrels and eighty pounds, each barrel containing 280 pounds. The lading of the vessel was completed on the 26th of September, and on that day the master signed his bill of lading and received his clearance from the custom house; but the vessel did not leave the harbor of Oswego until some time on the following day, which was the 27th of September.

On the 26th day of September the plaintiffs, by telegraph, inquired of Magill & Pickering what kind of salt they wanted, coarse or fine, and received a reply stating three-quarters fine, balance coarse; and on the same day they informed their agent, Staats, at Oswego, by telegraph, of the

exact nature of the reply. He received this dispatch after the bill of lading was signed and the vessel had received her clearance, and supposed, at the time, that she had actually left the Oswego harbor; but he made no effort to ascertain whether she had or not.

As a conclusion of law, the referee found from these facts, that the failure of Staats to inquire or ascertain whether the vessel had actually left the Oswego harbor, at the time he received the dispatch of the 26th, did not constitute such negligence as would relieve the defendant from liability in the premises.

And to that conclusion the defendant excepted.

It is clear, from the circumstance that the dispatch showing the mistake was received on the 26th, and the fact that the vessel did not leave Oswego upon her voyage until the 27th of September, that an opportunity was presented for the correction of the mistake by the unlading of three-quarters of the coarse salt from the vessel, if the plaintiffs' agent had exerted himself for the purpose of ascertaining whether or not that could, at that time, have been done. In commercial transactions, diligence is always expected, and its observance is often of the most vital importance.

And the law following and enforcing the usages of trade requires it to be exercised by all persons engaged in operations of this description. By that means profits are often secured and losses as surely prevented. As Staats was engaged in the business of trade and commerce, this duty must have been known to, and the necessity of its observance understood by him; and if an immediate effort had been made at once by him, or by any other person acting under proper directions from him, no doubt can be entertained but that the vessel would have been found, and the excess of coarse salt could then have been obtained from her. The legal duty resting upon all parties injured by the mistakes of others, to prevent the unnecessary accumulation of damages by reason of the mistake, required the plaintiffs' agent to make the effort to find the vessel and recover the salt.

The only reason found for his omission to do so by the referee is, that he supposed that the vessel had left the harbor; but no reasons are found to have existed justifying the existence of this supposition.

And the agent should, therefore, have put forth some immediate and adequate exertion to ascertain whether it was well warranted by the fact or not. His duty was of such a nature that he could not justify himself in the omission to perform it by a mere supposition, having no fact to depend upon beyond that of the vessel having received her clearance at some earlier period of the same day. It has never been uncommon for a vessel to remain in port one or two, or even more days, after receiving the clearance.

That is often received before the vessel is actually ready to commence her voyage, for the purpose of avoiding further delay after all her preparations for undertaking it have been completed. This was a fact so well known to persons engaged in the business of commerce that the agent of the plaintiff should have observed and acted upon it, instead of quietly reposing, as he did, upon a mere unwarranted supposition, leading him to a

different conclusion. Good faith to the defendant, as well as to the consignees of the salt, required that all reasonable exertions should have been made by the agent as soon as the mistake was discovered by him, for the purpose of securing its correction.

And if such exertions had been diligently made, it is entirely apparent, from the facts found by the referee, that the excess of coarse salt could have been recovered from the vessel, by the payment of her freight upon it from Oswego to Chicago, and probably for much less than that, if its place could have been supplied, as it possibly might, by the shipment of other property. But even if full freight should have been exacted and paid, that would have avoided the loss of thirty-five cents per barrel upon the excess of coarse salt, which was the difference between its market value at Oswego and Chicago.

As the damages recoverable in cases of this description are limited to the losses resulting from the injury complained of, whether it consists in the withholding of a legal right, or the breach of a legal duty, it follows that this difference was improperly imposed by the referee upon the defendants. The loss of this difference did not arise out of the negligent act of the defendant's agent in improperly transmitting the message, but out of the negligent omission of the plaintiff's agent to overhaul the vessel and correct the mistake, so far as it was then in his power to make that correction.

In the case of *Hamilton* v. *McPherson* (28 N. Y., 72), it was held by SELDEN, J., delivering the opinion of this court, that "The law, for wise reasons, imposes upon a party, subjected to injury from a breach of contract, the active duty of making reasonable exertions to render the injury as light as possible. Public interest and sound morality accord with the law in demanding this; and if the injured party, through negligence or willfulness, allows the damages to be unnecessarily enhanced, the increased loss justly falls upon him (Id. 76–7)." And this rule is as applicable to the present controversy as it was to the one then before the Court.

To the extent of the difference in the market value of three-quarters of the coarse salt between Oswego and Chicago, the judgment directed was erroneous, and it should be corrected by deducting that difference, amounting to the sum of $714.25 from it, as of the date of the referee's report; and as so corrected the judgment should be affirmed.