PATTON *et ux*. v. KINSMAN, and KINSMAN v. PATTON *et ux*.

1. **Husband and wife: WIFE'S CONTRACT.** Where the wife held in her own right a note secured by mortgage, and with her husband joined her son in the execution of a note to a third party for the benefit of the son, with the understanding between the parties that it should be paid out of the proceeds of the note and mortgage to the wife; after which proceedings to foreclose said mortgage were commenced and prosecuted to a sale of the mortgaged property, whereupon the certificate of sale was assigned, pursuant to the understanding, to the payee of the note to secure the payment of a second note executed by the same parties, for the surrender of the first, and an additional sum advanced to the wife: *It was held,*

that equity would treat the transaction as an executed contract to make the note a charge upon the separate property of the wife, and would enforce it as such, but that no personal judgment should be entered against the wife.

*Appeal from Henry District Court.*

WEDNESDAY, DECEMBER 7.

CONTRACTS OF MARRIED WOMEN: THEIR CONTRACTS, WHEN AND HOW ENFORCED IN EQUITY.—These two causes were consolidated below. The adversary parties are Mrs. Patton and Kinsman. From the pleadings and evidence the following facts appear:

In 1858, Mrs. Patton (formerly Mrs. Carson) was the owner, in her *own right and name*, of a note made by one Underwood, secured by a mortgage of certain property in Mount Pleasant. Her son, George S. Carson, not then of age, a fact known to all the parties, wished to buy a span of horses, wagon and harness, to go into the business of teaming. He proposed to buy these of Kinsman, who, it appears, is his father-in-law. Kinsman agreed to sell him a team, wagon and harness, on condition that his mother, Mrs. Patton and Mr. Patton would consent, and would sign the note with him. The price was agreed upon, and Carson and Mr. and Mrs. Patton executed a joint note to Kinsman for $400.00, on six months' time. Mrs. Patton had promised her son, George, that he should have enough of the proceeds of the Mount Pleasant property to buy a team. It was the understanding of all the parties, at the time of the sale, that Kinsman should be paid out of the money realized from the Mount Pleasant security. It became necessary afterwards to put the Underwood note and mortgage (the Mount Pleasant security) in the way of collection, which was done by Mrs. Patton, and the mortgage foreclosed. After Mrs. P. placed this claim in the

hands of her attorney, she gave Kinsman the attorney's receipt for the Underwood note and mortgage to secure him on his note, which was then due or past due. When the decree was obtained the receipt was returned to Mrs. Patton, who applied to Kinsman for money enough to pay the sheriff's fees and the costs of sale of the Mount Pleasant property. He agreed to loan her the requisite amount, "providing if she was the purchaser at the sale she would take up the old note for $400.00 and interest, and give a new note for the amount, including the money. Kinsman proposed then to let her have and secure it with the property purchased." This Mrs. P. agreed to do. Kinsman then advanced her $65.00 to pay the costs on the Mount Pleasant foreclosure. At the sheriff's sale Mrs. P. obtained the usual certificate, and pursuant to her agreement she did, on the 10th day of October, 1860, assign the same as collateral security to Kinsman. On the same day, and at the same time the old note of $400.00 was surrendered, and Carson, Mr. and Mrs. Patton all joined in a new note to Kinsman, at one year, for $537, being amount due on old note, and the $65.00 advanced, less $10.00 returned.

Kinsman executed and delivered a bond to Mrs. P., reciting that he held the sheriff's certificate as security for the payment of this note. When the sale of the horses, &c., was made, Carson lived with his mother, Mrs. Patton, and contributed something of the earnings of the team to the support of the family. One of the horses died. The rest of the property was sold by Carson for about $175; in payment for which, he received the note of the purchaser for $150, *which note Mrs. Patton has.*

The note to Kinsman not being paid, he obtained a sheriff's deed for the Mount Pleasant property, and, treating himself as a mortgagee, commenced his action to foreclose, as in the case of a mortgage, the title of Mrs. P., and to obtain a judgment on the note. Not far from the same time, Mrs. P.

and her husband commenced their action to set aside the sheriff's deed, or compel Kinsman to convey the premises to Mrs. P., on the ground: 1. Of fraud in Kinsman; and, 2. Because, being a married woman, and having signed the note as surety, the same is void, and hence the assignment of the certificate was without consideration.

The cause was heard by the Hon. FRANCIS SPRINGER, District Judge, upon the testimony, and a decree rendered that the property be sold. If more was realized than would pay the debt to Kinsman, the surplus was to go to Mrs. Patton. If less was produced by the sale, a general execution was to issue for the residue against Carson and Mr. Patton only. Mrs. Patton alone appeals.

*Ambler, Hemenway & Ambler* for the appellant.

*Seevers & Williams* for the appellee.

DILLON, J.—I. The appellant, Mrs. Patton, produced no evidence to sustain her charge of fraud against Kinsman. His conduct would appear from the testimony to have been, from first to last, entirely unexceptionable. Her case rests wholly upon the fact, that when the note was assigned by her, she was a *feme covert*. She claims that the note was for this reason void, and if void, there was no consideration for the assignment of the sheriff's certificate as security for its payment, and if so, she is entitled to have the property conveyed to her by Kinsman, free of any charge or claim on his part.

1. HUSBAND AND WIFE: wife's contract.

Her case may be considered under two aspects: 1st. What would be her rights if she is treated as a *surety* for Carson to Kinsman; and, 2d. What would be her rights if she is treated (as respects Kinsman) as one of the principals in the note given for the horses, wagon and harness. The Underwood note and mortgage were her separate property, and so, of course, was the sheriff's certificate which

arose therefrom.  These are uncontroverted facts.  In the case of *Jones* v. *Crosthwaite et ux.*, *ante*, we had occasion to consider, quite at length, how far a married woman, by our law, as it now exists, is regarded as being discovert. The observations and argument, as well as the decision of the court in that case, related to the rights of the parties in a court of law.  This proceeding, it must be remembered, is *in equity*.

It might admit of great doubt, whether, as a matter of fact, Mrs. Patton is entitled to be considered as having, as against Kinsman, the rights of a surety.  He swears that they all bought the property, that he looked to all for payment, though it was purchased for George's benefit.  On the other hand, Mrs. Patton testifies that she was simply surety for her son, though she distinctly admits that she had promised to give her son money to buy a team, that Kinsman knew this, as she supposed, and that "it was the understanding between George, Kinsman, Mr. Patton and herself, at the time the horses were purchased, that they were to be paid for when the money due on the mortgage on real estate in Mount Pleasant was obtained."

We are not called upon to decide whether, if this understanding had rested in *agreement* merely, that is, if it had never been *executed* by the *actual transfer* of the sheriff's certificate, a court of equity, upon the supposition that she was a *surety* merely, would make this a charge upon her separate estate, that is, upon the Mount Pleasant property, or other separate property of hers.  Under the doctrine of *Jones* v. *Crosthwaite et ux.*, *supra*, a contract by Mrs. Patton to buy property for her son, she agreeing to become, and actually becoming, his surety, would not be a contract " in relation to her separate property," so as to make her individually and personally liable *at law*.  Rev., §§ 2505, 2506, 2772, 2933.  But equity, as is well known, and as is observed in that case, sometimes enforces, as against the estate of a

married woman, obligations on which she is not liable *at law*. These are chiefly cases where the debt has been beneficial to her, or to her separate estate, or contracted on the faith of it. There must be an *intention*, so the authorities all agree, *to charge her separate estate*. The great controversy has been, how this intention shall be evinced, in cases where it has not been *expressly* declared. This controversy is yet far from being settled, either in England or America. It is, perhaps, more correct to say, that it is to-day more *unsettled* than at any previous period. Mr. STORY, whose authority upon questions of this character, is entitled to especial weight, lays down the doctrine in this guarded, cautious, uncertain and surely most unsatisfactory manner: "The fact that the debt has been contracted during the coverture, either as principal *or as a surety* for herself or for her husband, or jointly with him, *seems ordinarily* to be held *prima facie* evidence to charge her separate estate without any proof of a positive agreement or intention to do so." 2 Story Eq. Jurisp., § 1400. But the fault is not the author's. Adjudicated cases, upon which the authority of an elementary work principally rests, will not justify any decided and positive statement. See Notes to *Hulme* v. *Tenant*, 1 American Leading Cases, 389, and authorities cited in *Jones* v. *Crosthwaite et ux.*, in concluding portion of opinion; see also *Burch and Wife* v. *Breckinridge*, 16 B. Mon., 482; *Jarman* v. *Wilkerson*, 7 Id., 293; *Bell & Terry* v. *Kellar*, 13 Id., 384; *Collins* v. *Lavenberg*, 19 Ala., 183; *Collins* v. *Rudolph*, Id., 616; holding, for example, that an execution of a note, or the written admission of an account by a married woman, indicates an intention to bind her separate estate. These cases are the type of a large class. On the contrary, other cases hold that the intention to charge must be *express*, and the giving of a note is not sufficient. See, as examples of these, *Letton* v. *Baldwin*, 8

Humph., 209; 10 Id., 552; *Coun* v. *Coun*, 1 Md. Ch. Decis., 212.

· Relating to this subject, one of the most recent and thoroughly considered cases, is *Yale* v. *Dederer et ux.*, 21 Barb., 286; *S. C.*, 18 N. Y., 265; and *S. C.* again, 22 N. Y., 450. The final conclusion there reached (which has much to commend it, though it may not have the support of the most numerous decisions), is, that in order to create a charge upon the separate estate of a married woman, the intention to do so must be declared in the very contract which is the foundation of the charge (or it should, perhaps, be added, some other explicit and positive contract), or the consideration must be obtained for the direct benefit of the separate estate itself; and it was accordingly decided that where a married woman signed a note as *surety* for her husband, it would not be a charge upon her separate estate though so intended. Without undertaking, in a case where it is not necessary to do so, to decide which or what, amidst this vexatious conflict, is the better doctrine or the true rule, it is sufficient to say that if Mrs. Patton is to be considered as a *principal* debtor (and she ought to be so regarded certainly as to the $55, and the amount of the note, $150, for which Carson sold part of the property), she would have less claim to have her estate exempted from an equitable charge, than if she was a surety simply. But in this case the result is precisely the same, whether she is principal or surety. The claim on Underwood was her "separate property." The sheriff's certificate was likewise hers. Upon a valuable consideration furnished by Kinsman, who would not part with his property without her consent and her responsibility, upon the strongest moral considerations founded upon her repeated promises, made without objection from her husband, and, in fact, with his acquiescence, she *executed* the understanding and agreement of the parties.

The transaction with Kinsman was in equity a *mortgage* of her separate property to him. This is binding upon her in equity, and equity will enforce this debt, not against her personally, indeed, but against the property which she has pledged for its payment. "A wife," says KENT (2 Com., 167), "may also sell or *mortgage* her separate estate for her husband's debts," and so equally may she do so for her son's debts; and such a mortgage, when founded upon a valuable consideration, and not unfairly obtained, is enforceable in equity. For further authorities on this point, see *Jones* v. *Crosthwaite et ux.*, before referred to; *Young and Wife* v. *Graff*, 28 Ill., 20.

The decree below was right. It was against the mortgaged property, and against the husband (who was *sui juris*), and the minor (who makes no objection), *personally*, but as to Mrs. P. it only extended to subjecting the specific property which she had pledged to the payment of the debt for which she had pledged it.

II. It is also assigned for error that the court improperly allowed Kinsman to introduce *parol* evidence on the hearing of *his cause* to the effect that he had tendered Mrs. Patton a deed and demanded his money before his suit was brought, and that she refused to accept the deed or pay the note. The answer to this is plain. The evidence was immaterial, as his right to file his petition in foreclosure (his debt being due and unpaid), was not dependent upon making the tender and demand which were proved in the testimony whose reception is complained of by the appellant.

Affirmed.