## Richmond.

WESTERN UNION TELEGRAPH CO. v. REYNOLDS BROS.

February 15th, 1883.

1. TELEGRAPH COMPANIES are not public carriers in the strict sense of the term, yet on account of the public nature of their employment, they have in many cases been held to a very similar responsibility.

2. IDEM—*Contract—Statute.*—The obligation of such companies, upon payment of the usual charges to transmit faithfully and promptly all messages presented for transmission, rests, in Virginia, not merely on contract, but is imposed by Code 1873, ch. 65, § 2.

3. IDEM—*Regulations.*—Such companies may make their own regulations for the conduct of their business, but they must be reasonable and not in conflict with any liability imposed by law, and they cannot relieve themselves from liability for the improper or negligent conduct of their servants or defective character of their instruments.

4. IDEM—*Negligence—Measure of damages.*—Where such company has received a message for transmission and the usual charges according to their regulations, it is bound to transmit the message faithfully and promptly, whether it be in "cipher" or "intelligible," and should the company negligently fail to transmit such message altogether, or to transmit it faithfully and promptly, it will become liable to an action for damages by the party aggrieved, and the measure of damages in such case is such loss as the party aggrieved has sustained by reason of the wrongful act of the company in violation of the duties imposed on it by law. A more precise statement of the rule is : The company is liable to all the direct damages which both parties would have contemplated as flowing from the breach of the contract or violation of the duty, if, at the time, they had bestowed proper attention to the subject, and had been fully informed of all the facts.

5. PRACTICE AT COMMON LAW—*Instructions.*—Telegraph Company received a cipher message for transmission, and the usual charges according to its regulations, and failed altogether to transmit it, whereby the sender lost a large sum of money, and brought his action for damages against the company. At the trial the defendant asked the court to in-

struct the jury that in order to make the defendant liable for more than nominal damages, they must believe from the evidence that the defendant was substantially informed of the meaning of the message and of the approximate extent of the plaintiff's liability to loss in case of failure to transmit the message promptly and correctly. Court below refused. On error to this court,

HELD:

The instruction was improper and rightly refused.

6. IDEM—*Erroneous instruction—Right verdict.*—Court below gave an erroneous instruction; but if from the whole record the appellate court sees that even under correct instructions a different verdict could not have been rightfully found, it will not reverse the judgment and send the cause back for a new trial.

Error to judgment of corporation court of city of Norfolk rendered against the defendant in the action lately therein pending, wherein Reynolds Brothers were plaintiffs, and The Western Union Telegraph Company was defendant.

The facts are fully set forth in the opinion of Judge Lacy.

*Robert Stiles,* for the appellant.

*Richard Walke,* for the appellees.

LACY, J., delivered the opinion of the court:

On the 17th day of October, 1878, Reynolds Bros., of Norfolk, presented at the office of the Western Union Telegraph Company, in that city, a dispatch to be sent over the said company's line from Norfolk to Manchester, England. The telegraph company, the plaintiff in error, received this message together with the usual charges of the company, for sending a message of like kind, and undertook to send it forward.

This dispatch was never sent from the company's office in Norfolk, and so never reached its destination in Manchester, England.

For the failure to send this dispatch, the telegraph company was sued by the said Reynolds Brothers in the corporation court

·of the city of Norfolk in September, 1879. When this suit matured and came on for trial, there was a verdict for the plaintiff for $1,347.10, and judgment was entered against the defendant company accordingly on the twenty-first day of April, 1880.

From this judgment the telegraph company applied to this court for a writ of error and *supersedeas*, which was awarded on the 6th day of July, 1880.

The delinquency of the telegraph company seems to be as frankly and clearly admitted by the appellant, as it is charged and proved by the appellees. There is no question here, as there was none in the corporation court of Norfolk, as to the neglect and entire failure of the telegraph company to send the dispatch entrusted to it for transmission; and there is an admission of their liability to damages in the case, the only question at issue between the parties is the measure of damages.

And it is admitted, and is equally clear from the evidence in the case, that the actual loss sustained by Reynolds Brothers was the amount found by the jury of $1,347.10, nothing being added by the jury as punitive or vindictive damages. The appellant insists that the only damages for which it was liable was the price of the message actually paid them. The question then brought by this case before this court is, what is the measure of damages for which a telegraph company is liable upon a failure to send a dispatch received for transmission, and upon which the usual charges of the company had been paid under the laws of this state.

The statute of Virginia in regard to the transmission of dispatches by telegraph companies is as follows:

"It shall be the duty of every telegraph company doing business in this state to receive dispatches from and for other telegraph companies or lines, and from and for any person; and upon the payment of the usual charges therefor, according to the regulations of the company, to transmit the same faithfully

and impartially, and as promptly as practicable, and in the order of delivery to the said company.

"For every failure to transmit a dispatch faithfully and impartially, and for every failure to transmit a dispatch as promptly as practicable, or in the order of its delivery to the company, the company shall forfeit the sum of one hundred dollars to the person sending, or wishing to send such dispatch, *and shall moreover* be liable to an action of damages by any party aggrieved " &ast; &ast; &ast; &ast; &ast; &ast; &ast;

Section 2d, chapter 65, Code of 1873, page 619.

This statute was enacted by the legislature in 1866, and has never been amended, altered or repealed, and is the law in Virginia. This statute provides for a penalty of one hundred dollars in every case of a failure to send a dispatch, as required by law, and gives moreover, and in addition, an action for damages to any party aggrieved by the failure of any telegraph company to send a dispatch in accordance with the requirements of the law. This statute has never been construed by the courts. The only reported case in this state was decided before the passage of the act. That is the case of the *Washington and New Orleans Telegraph Co.* v. *Hobson,* reported in 15th Grat. 122. Judge Daniel delivered the opinion of the court, which was unanimous. That case was not referred to by counsel who argued this case on either side.

That was an action on the case in the circuit court of the city of Richmond, instituted by *John C. Hobson & Son* v. *The Washington and New Orleans Telegraph Co.* The said Hobson & Son, on the 2d of March, 1854, delivered to the telegraph company, at Richmond, a message to Smith & Co., of Mobile, and paid the sum demanded for its transmission. The message ordered the purchase of five hundred bales of cotton. The message was changed in transmission to read twenty-five hundred instead of five hundred. Suit was instituted and tried November term, 1855 ; the verdict was for $7,341.45, with interest.

That case was considered and decided in this court upon many questions growing out of the circumstances of that particular transaction, the proceedings on the trial, and the instructions given and refused by the court, which are not applicable to this case. In that case, however, it was decided among other things, that in an action against a telegraph company for damages sustained by the plaintiffs by the alteration of a message sent on their line, whereby an order to the plaintiff's factors in Mobile to buy five hundred bales of cotton was altered to twenty-five hundred bales, but not charging negligence in the company, an instruction that the defendants are not responsible as common carriers, but only as general agents, for such gross negligence as in law amounts to fraud, is not authorized by the pleadings, and was properly refused. In such case, *if the company is liable to the plaintiffs for damages* arising from the alteration of the message, *the measure of these damages is what was lost on the sale at Mobile of the excess of the cotton above that ordered*, or, if not sold there, what would have been the loss of the sale of the cotton at Mobile in the condition and circumstances in which it was when the mistake was ascertained, including in such loss all the proper costs and charges thereon. The court leaves open the question whether the telegraph company could be held liable as common carriers, because the question was not properly raised in that case. Judge Daniel in his opinion says: "It was, I think, the duty of the defendants in error, as soon as they were apprized of the mistake or alteration in their message, and of the purchase by their factors of the two thousand and seventy-eight bales of cotton, if they intended to hold the company responsible for the excess of the cotton over the five hundred bales of cotton, to have notified the company of such intention, to have made a tender of such excess to the company on the condition of its paying for the same, and all the charges incident to the purchase, &c. The principles and rules regulating the subject required, as I conceive, a sale of

said five hundred bales of cotton also at the nearest market." In that case the company had offered to take the purchase of the cotton upon themselves, and this offer had been refused. In the judgment of the court we find the following: "That the said circuit court ought to have instructed the jury that in case they should find for the said defendant in error, they should, in fixing the amount for which to render their verdict, ascertain the loss sustained," &c., &c. From the comparative obscurity of the whole subject at that time, and in that case growing, in great measure, out of the subsequent transactions of the parties with the two thousand and seventy-eight bales of cotton which was purchased under this mistake, the court was debarred from passing upon many questions thereon, but the measure of damages does not seem to have been in doubt, and was declared to be the loss sustained by the senders of the message in consequence of the mistake or neglect of the telegraph company. At the time of the decision of this case there was no law in Virginia which declared specially that it should be the duty of the telegraph company to promptly send a message under a penalty.

Since that time, as we have seen, to-wit, in 1866, a law has been enacted by which a telegraph company is so commanded and directed, and every telegraph company which, since that time, has refused or failed to promptly, *as promptly as practicable*, transmit a dispatch delivered to it upon which the usual charges have been paid according to the regulations of the said company, has violated a statute of this state. And by the general law of this state, any person injured by the violation of any statute, may recover from the offender *such damages as he may* sustain by reason of the violation.

See fifth section, chapter 145, Code 1873, which is as follows: "Any person injured by the violation of any statute, may recover from the offender such damages as he may sustain by reason of the violation, although a penalty or forfeiture for such violation be thereby imposed, unless the same be expressly mentioned to be in lieu of such damages." This statute was adopted

upon the recommendation of the revisors in their report to the general assembly in 1847, and was, as reference to their report shows, recommended and adopted as a general statute, and it seems, in terms, to provide for the measure of damages in any case in which there shall be an injury resulting from the violation of any statute in this state.

But it is earnestly contended that this is not the rule for the measure of damages in the case of a neglect on the part of a telegraph company to comply with the law. It is argued with much subtlety that a telegraph company deals with an agent which no power can chain, and which brings to nought the utmost diligence and best endeavor, and no reasonable man would expect a company to contract against the freaks of the lightning or the electric current. However all that may be in cases to which it may be applicable, it is not involved in this case. This is a case of the utter failure of the company to send, or attempt to send, the dispatch. The dispatch was delivered to the said company, and was not sent over the lines at all.

It is also admitted by the appellant that in ordinary cases of dispatches of a business character, plainly written and easily understood, the measure of damages would be such as were actually caused, measured by the actual loss sustained by the sender on account of the failure to send the dispatch; but it is claimed that if the dispatch is written in what is called cipher dispatch, unintelligible to all but the sender and receiver, in such case the appellant claims that the measure of the damages is only what was paid by the sender to the company for the dispatch.

In this case the dispatch consisted of nine letters, to-wit: "N. a. r. r. e. e. n. d. a." Connected they have no meaning to the uninitiated, and separated they still signify nothing without the key. The address was also in cipher, but was registered at the office of the company with the translation, and the dispatch was directed to be sent to Manchester, England. If the said message had been translated at the company's office, then it is con-

ceded that the measure of damages would have been such loss as was actually sustained by the sender; but if it had been translated, and had been intelligible, it would not have been sent, if the failure to send was either the result of accident or of wilful negligence. It may be of profit to briefly examine the decisions under which this distinction has grown up in the courts between what is called cipher dispatches and those that are intelligible. It will not be possible, without too great consumption of time and too much swelling the proportions of this opinion, to examine all the case reported on this subject, for, although, the earliest cases are yet recent, the citations in this case show that the decisions already reach over all the states of this Union, and over other countries, and, although but a few years have elapsed since the invention of the electric telegraph, it is already in very general use. "It joins provinces and nations, separated by streams and seas, and now covers our country and spans the ocean between the two great continents, and wherever it exists it is largely used as an instrument of communication for social, business, or political enterprise. In Europe and in this country there are laws regulating the construction, establishment and use of the electric telegraph, and they embrace a wide extent and variety of topics." We have to do in this case chiefly with the *contract* between the sender of a message and the telegraph company and the *breaches* of this contract.

The legal character of a company, working a telegraph line, has been the subject of adjudication in many cases. In some cases they have been distinctly held to be common carriers, and in others that has been asserted with some qualifications—in the only case in this state where this subject has been considered the question has been left open, as we have seen already in considering that case. In the case of *Parks* v. *Alta California Tel. Co.*, 13 Cal. 422, the court says: "The rules which govern the liability of the telegraph company are not new, they are old rules applied to new circumstances. Such com-

panies hold themselves out to the public as engaged in a particular branch of business, in which the interests of the public are deeply concerned. They propose to do a certain service for a given price. There is no difference in the general nature of the legal obligation of the contract between carrying a message along a wire and carrying goods or a package along a route. The physical agency may be different, but the essential nature of the contract is the same. In both cases the contract is binding, and the responsibility of the parties is governed by the same general rules." In *McAndrews* v. *Electric Telegraph Company*, 33 Eng. L. and Eq. 180, telegraph companies are spoken of as being in the position of carriers, who would be liable at common law, but who may limit their liability by special notice; but the only question before the court in that case was the reasonableness of the regulation relieving the company from liability for unrepeated messages. A similar view was taken in *Bowen* v. *Lake Erie Tel. Co.*, 1 Am. Law Register, 685, where it was held that telegraph companies, holding themselves out to transmit dispatches correctly, are under obligation so to do unless prevented by causes over which they have no control. In *Baldwin* v. *United States Telegraph Company*, 1 Lansing, 125, these companies are regarded substantially as common carriers.

In *Birney* v. *N. Y. and Wash. Printing Telegraph Co.*, 18 Md. 341, it is held that the telegraph companies cannot be held responsible as common carriers are at common law for the safe *delivery* of their messages; that a telegraph company, owing to the innumerable causes which may disturb the security of its lines, would be almost as often open to ⹁ liability because of the providences of God unknown to it, as because of any other reason, and should be regarded as a bailee performing for its employer, through its agents, a work according to certain rules and regulations; and in *De Rutte* v. *N. Y., Alb. and Buffalo Tel. Co.*, 1 Daly (N. Y.) 547, the court of common pleas say: "These reasons which are usually assigned for the extraordinary

responsibility of common carriers, cannot be regarded to the *same extent* as applicable to telegraph companies, nor are there any reasons in our judgment why they should be held liable to any extent to the responsibility of *insurers* for the *correct transmission* and *delivery* of intelligence."

Similar views are expressed by the supreme court of New York in *Breese* v. *U. States Telegraph Co.*, 45 Barb. 274, and by the supreme court of New York in the case of *Leonard* v. *N. Y., &c.; Tel. Co.*, 41 N Y. 544, and in *New York and Wash. Tel. Co.* v. *Dryburg*, 35 Pa. St. R. 298; *Shields* v. *Wash. and New Orleans Tel. Co.*, 11 Am. L. Journal, 311; *West. U. Tel. Co.* v. *Carew*, 15 Mich. 525.

And in the case of *Ellis* v. *Am. Tel. Co.*, 13 Allen, 226, it was held that the provisions of the statutes of Massachusetts concerning telegraph companies apply to foreign companies doing business in that state. While it seems, from an examination of many decisions, that the weight of judicial opinion is that telegraph companies are not common carriers in the strict sense of the term, yet on account of the public nature of their employment they have been held in many cases to a very similar degree of responsibility. In the case of *Baldwin* v. *U. S. Tel. Co.*, cited above, it is held that, "Although telegraph companies are not, strictly speaking, public carriers for the reason that they do not have tangible possession of goods, which can be destroyed or stolen, yet from the public nature of their employment, the important matters confided wholly to their care and the skill and fidelity required in the proper performance of their duties, their legal characteristics become so analogous to those of common carriers that the law must consider them as such, subject only to such modifications as the peculiar nature of their business renders necessary. And also in a case already cited it is said: "Like the business of common carriers, the interests of the public are so largely incorporated with it that it differs from ordinary bailments, which parties are at liberty to enter *into* or not, as they please." The common carrier makes his contracts

under special rules of law. The essentials of these are that he is regarded as a *quasi* public officer, entering into definite rela⁻ tions with the public, and having on this ground some peculiar rights and some peculiar *obligation.* Another obligation of the common carrier is that he is bound to treat all the public alike, and to carry all goods offered to them. This is required by many of the statutes of other states and is certainly required by the statute of Virginia, of telegraph companies. The telegraph companies advertise publicly that they will transmit messages. This is an offer to the public and to all who compose it, and when any one to whom this offer is made, accepts it by tendering a message, the offer and acceptance constitute a contract; this is like a common carrier.

It cannot, however, be claimed that the obligation of a tele⁻ graph company to send a message grows entirely out of the contract with the sender in Virginia; in this state the obligation rests upon them for the accurate transmission and faithful deliv⁻ ery of messages *under the statute,* as we have seen, as it does upon inn-keepers, common carriers, and the like, upon whom legal duties rest, resulting from their occupation and profes⁻ sion, and who owe a duty to the public irrespective of their en⁻ gagements in particular instances. See *Heyward* v. *McCracken,* 2d Howard, 608. In the case of *Playford* v. *United Kingdom Tel. Co.,* L. R. 4, Q. B. 707, the court of Queen's Bench say: " We cannot agree with the judgment given in the American courts in the cases cited in the argument, that there is any analogy between a consignment of goods through a carrier and the transmission of a telegram, the obligation of the company rests *entirely upon contracts.*" As we have seen, this *cannot be true in any state or country where the obligation rests upon them under the statute,* and where there is an obligation resting upon them under the statute to send a tele⁻ gram in advance of any contract whatever; and in Virginia a telegraph company cannot refuse to make the contract with the sender without violating a penal statute of this state; and if

they are under obligations, which they cannot avoid, to send every dispatch which is offered, how can their obligation be said to rest upon the contract alone? Their obligations under the laws of this state are such that they are compelled to make the contract, and when it is made by receiving the message and the price for its transmission, according to their own regulations, they are under obligations to send it, both under their contract to send it, and under the law which makes it their duty to send it. See *Heyward* v. *McCracken,* cited above. And to this end they are bound to have suitable instruments and competent servants, and see that the service rendered to applicants is rendered with the care and skill which its peculiar nature requires.

In the case of *Sweatland* v. *Illinois and Miss. Tel Co.,* 17 Iowa, 433, after the message was received the instrument began to splutter, and it turned out that the message was inaccurately sent. Upon the trial it was proved that the instrument was defective, and the company was held liable. They must send messages in the order in which they are received, except in such cases as the statute authorizes preferences to the government, &c. ; and they must send them with promptitude.

In the message-blanks, now commonly used, the conditions are printed upon the face of the paper in such a manner as to make them a part of the contract for transmission. This the company may do, provided the conditions are reasonable, as they are entitled to make all reasonable rules for the conduct of their affairs. This reasonableness will be dependent upon the circumstances of the case and the rulings of the court applying the law to the facts. By these rules they may require prepayment under our statute and other stipulations, such as an application for redress within a reasonable time, and due notice of any claim for damages within a reasonable time; and these regulations must be applied with due regard to rights of senders. A rule that the company would not be answerable for damages, unless the claim was presented within sixty days after the message was sent, was held reasonable and obligatory on the

sender, who had notice of it, in *Wolf* v. *Western U. Tel. Co.*, 62 Penn. St. 83; but if it should turn out from any cause that knowledge of the injury was withheld by the company or their agents unreasonably, or that the message was not sent at all, and information did not come to the sender until the expiration of the company's period of limitation, the ruling would seem to be properly the other way.

These conditions must not only be reasonable, but they must be reasonably construed; and a company would not be held able thus to make a contract against all liabilities, nor indeed against any liability imposed by the law upon them, nor relieve themselves from liability for the improper or negligent conduct of its servants. See the case of *Express Co.* v. *Caldwell*, 21 Wallace, 265. Telegraph companies, like railroad companies, owe important duties to the public. Generally there are no competing lines, and if so the business is necessarily in the hands of a few. These companies must act in good faith toward the public, and cannot by general conditions demand unreasonable concessions from those proposing to send messages.

It is not necessary to discuss what might lawfully be done by a special contract, but companies cannot adopt general printed rules, exacting as a condition for sending messages that the sender shall exonerate or release the company from damages caused by defective instruments, or by want of proper skill in the operators, or by their failure to use due care. See *Gildersleeve* v. *U. S. Tel. Co.*, 29 Md. 232.

In *Baldwin* v. *U. S. Tel. Co.*, 1 Lansing, 125, it was held with regard to notices limiting the liability of the company, that "the same rule applied to them as to common carriers, and that their liability would not be limited by the notices, even if brought to the knowledge of the sender." The same rule has been applied in many other cases. When a company has once been ascertained to be liable for damages under the rules and principles stated above, in this, as in every other case, the measure of these damages must be fixed by some rule which should

be generally understood and well settled. We have seen
one Virginia statute upon this case in this regard. The
rule of damages is thus laid down by Earle, J., in the case
already cited of *Leonard* v. *N. Y. &c. Tel. Co.*, 41 N. Y. 544,
"The measure of damages to be applied to cases as they arise,
has been a fruitful subject of discussion in the courts." The
difficulty is not so much in laying down general rules as in ap-
plying them. The cardinal rule undoubtedly is that the one
party shall recover all the damages which have been occasioned
by the breach of contract by the other party. But this rule is
modified in its application by two others. The damages must
flow directly and naturally from the breach of contract, and they
must be certain both in their nature and in respect to the cause
from which they proceed. Under this latter rule, speculative,
contingent and remote damages, which cannot be directly traced
to the breach complained of, are excluded. Under the former
rule such damages are only allowed as may fairly be supposed
to have entered into the contemplation of the parties, when they
made the contract, as might naturally be expected to follow its
violation. It is not required that they must have contemplated
the actual damages which are to be allowed; but the damages
must be such as the parties may be fairly supposed to have con-
templated when they made the contract. A more precise state-
ment of the rule is, that a party is liable for all the direct dam-
ages which both parties would have contemplated as flowing
from its breach, if at the time they entered into it, they had be-
stowed proper attention upon the subject, and had been fully
informed of the facts."

In that case, the measure of damages was held to be the dif-
ference in the market prices of the salt at Chicago and at Oswego
on the day of shipment, together with the charges of transporta-
tion.

In the case of *Squire* v. *West. U. Tel. Co.*, 98 Mass. 232, plain-
tiffs had accepted by telegraph an offer for the sale of a number
of hogs in Buffalo. The dispatch was not promptly delivered,

and the hogs were sold to another party. The court said the damages should be such a sum as would compensate the plaintiffs for the loss and injury sustained by them. Where the dispatch directed the immediate attachment of property on a suit in plaintiffs' favor, and by reason of delay in transmission, the opportunity for making the attachment was lost, the company was held liable to pay the whole sum which would have been secured had the attachment been seasonably made. 13 Cal. 422.

In the case of *Rittenhouse* v. *Independent Line of Telegraph*, 1 Daly, 474, it was held that so long as the words were plain, the fact that the meaning was unintelligible to the operator would not discharge the company.

So in *Bowen* v. *Lake Erie Tel. Co.*, 1 Am. Law Reg. 685. When an order is sent by telegraph for the purchase of an article, and by mistake the name of another article is substituted, and the receiver purchases this last named article, the company is held liable for the damages resulting from the failure to purchase the article actually ordered, &c.

And this, as we have seen, was held in the case of *Wash. and New O. Tel. Co.* v. *Hobson*, 15 Gratt. 122.

In the case of *Hadley and al.* v. *Baxendale and others*, 9 Exchequer R., p. 341, much relied on at bar, the rule of damages is stated in that case to be as follows:

" When two parties have made a contract, which one of them has broken, the damages which the other party ought to receive with reference to such breach of contract, should be such as may fairly and reasonably be considered either arising naturally— *i. e.*, according to the usual course of things—from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties at the time they made the contract, as the probable result of the breach of it."

In the case of *The Western Union Tel. Co.* v. *Bertrand*, supreme court of Texas, in delivering the opinion of the court in that case, Watts, J., said:

"In the transmission and delivery of messages, telegraph companies must, from the nature of the business in which they are engaged, and their relations to the general public, *be held to a strict rule of diligence.* They accept benefits and *franchises granted by law, including the extraordinary right of eminent domain.* The considerations that induce the public to confer these rights and franchises is, that it may thereby be furnished with a safe speedy means for the prompt transmission of information between places remote from each other; and as these corporations are on the one hand created for the accommodation and convenience of the public, and on the other organized and put in operation for the mutual profit of the members, the law assigns them a sort of dual position. In their relation to and with the public they are deemed a kind of public institution, strictly private. The law recognizes this twofold character of these corporations, and regulates and determines their rights accordingly."

In the case of *Griffin* v. *Colver*, 16 N. Y. 489, Selden, J., treating of the measure of damages said:

"The party injured is entitled to recover all his damages, including *gains prevented*, as well as *losses sustained.* The amount which would have been received, if the contracts had been kept, is the measure of damage if the contract is broken."

An important distinction has been drawn in some of the cases, to-wit: that in a case where the dispatch was not delivered, in suit, by the person entitled to receive, held that the contract was not made with receiver of the telegram, and he was not entitled to sue. *Playford* v. *United Kingdom Electric Tel. Co.*, Allen's cases, p. 438. This distinction cannot hold under our laws, which gives right of action to the receiver in the same manner as to the sender, and directs under a penalty the same promptitude and due care as to the receiver, or the delivery of the message, as to the transmission of the message. See third section, chapter sixty-five,

Code 1873. The duties and obligations of telegraph companies to the public have been in all the states the subject of legislative action; in most of the states the laws are very rigid and stringent; in some states the company is not only liable for fines and forfeitures, but to action for damages, but the offending officers and agents are declared liable to heavy fine and long imprisonment. Rev. Laws of Nevada, sec. 3,500–3,505. In other states they are subject to the general rules of law, and included under the general rule concerning corporations generally. Statutes of Minn., section eighty-three, page 903. In still other states the fine or forfeiture is more limited, and is measured by the amount paid for the message. Rev. Statutes of Maine, sections one and two, chapter fifty-three. In the state of Colorado the company is held liable for all damages resulting from their negligent failure to perform their duties and obligations to the public. Gen'l Laws of Colorado, pages 178 and 292.

In Virginia there is no distinction drawn by law between one class of messages and other classes. The second section of chapter sixty-five, Code 1873, denounces a penalty for every failure to transmit A DISPATCH, &c. There is no distinction drawn in the law as to one sort of promptitude with reference to one kind of dispatch, and another sort, and less degree of promptitude with reference to another kind of dispatch. A telegraph company in this state is required to send *every dispatch* presented to it, on which the usual charges are paid according to the regulations of the company. The degree of negligence in each case, and the extenuating circumstances attending, will depend upon the character of each case. If the company will strictly perform its obligations, and is in no default on its part, the law makes provision for its protection as in the case of all common carriers or institutions in which the public has rights.

In this case the company entirely failed *to do anything on its part*, except to make the contract, *receive the message and the price*, the usual charge for sending the same according to the

regulations of the company, and then, so far as this record shows, threw the dispatch away, and did nothing more. And the said company seeks to justify this neglect and failure of duty on its part by drawing a subtle and fine spun theory about the character of the dispatch, it not being understood by the company as to its full meaning, and as to what the courts have decided in this country and in England about cipher dispatches. If the company had not *undertaken* to send this dispatch upon the ground that it was unintelligible to it, then this defence might, perhaps, be considered; but the distinction between the two sorts of dispatches, which would relieve the company from obligation to send a dispatch which they have agreed to send, and which they have received money to send, and which they are bound by the law to send, is not founded on the law, and we do not think it is founded on any sound legal principles. If there was any contemplation between the parties as to the damages, or if there had been any contemplation at the time of the contract between them of the damages likely to be demanded on the one hand, and to be payable on the other, it is difficult to discover on what basis their joint views could have rested on this subject of damages, upon a failure, other than the one we have considered—to-wit, the amount in which one party is injured by the neglect of the other to perform his contract on his part— to-wit, the *loss sustained.*

It seems that in this case whatever may have been the reason in other cases, the obligation of the company to send this dispatch looked at solely from a stand-point of a contract between the parties, is in no degree lessened by the fact that the dispatch was a set of *nine letters,* instead of nine words—words are sent over the wires by letters, and letters have to be sent in order to send words. It was less difficult to send a set of nine letters than to send the same number of words, and it is shown to be the every day business of the company to send a set of letters or a set of words, as they may be requested, and there is nothing to show that the task of the company was increased or made more

difficult by the agreement with the appellees to send the dispatch composed of the nine letters mentioned above composing the said telegram. The statute of Virginia imposing the obligation upon the telegraph company to promptly send a dispatch is plain and unequivocal in its terms, and it is only by going outside of its language, and thus beyond the law itself, that any question can be raised or suggested as to its meaning. The object of the legislature in enacting it, is obvious enough, but upon inspection of the journal of the house of delegates, 1865–6, we find that on the 15th of January, 1866, the house of delegates instructed the law committee to report to that body what legislation is necessary to secure greater *promptitude* in the transmission and delivery of messages by telegraph companies; and soon after that committee reported the bill which is the present law. The object of the law then was, as its terms import, to secure greater promptitude in the transmission and delivery of dispatches. Shall this court enforce the law as it is written, or go outside its plain terms to find a different meaning?

To say that under this law a company may send a message or not, as it may happen to fancy, unless the message is plain and intelligible, and written out in full, would be to entirely destroy the act of the legislature, and leave these companies *without other restraint than that which is self-imposed.*

Few dispatches are ever perfectly plain and full in their meaning, and a vast proportion of all their business is done either in cipher, or disconnected words or sentences.

We are of opinion that the law should be enforced, and if the legislature shall see fit to draw a distinction between different sorts of messages, it will more properly come within the scope of their powers.

In this case the court was asked by the defendant to instruct the jury, that in order to hold the defendant liable for more than nominal damages, they must believe that the defendant company was substantially informed of the meaning and purport of the message in said telegram contained, and of the facts and

approximate extent of the plaintiff's liability to loss in case of failure to transmit the said telegram promptly and correctly.

This instruction was properly refused by the court, and there was no error in such refusal of the court; and there was no error in the refusal of court to give any instruction asked for by the defendant, for reasons already stated. The said corporation court of Norfolk did err, however, in giving to the jury the instruction given by the court in lieu of those asked for by the defendant, which are substantially the same as those asked for by the defendant, and should not have been given to the jury, for the reasons already stated.

But as the verdict of the jury is plainly right, the said court did not err in refusing to set it aside. The court is of opinion that there is no error in the record which has worked an injustice either to the plaintiff or defendant below, and upon the principles of the case of *The Bank of Danville* v. *Waddill*, 27 Gratt. 448, the court will not reverse and remand the case for an error which has not, as appears by the record, resulted in any injury of which the appellant can complain.

The jury has assessed the damages in violation of what may be claimed to be the clear meaning of the instructions of the court below; but the verdict is nevertheless plainly right, and adopts a measure of damages fixed by law for this case and every similar case, "which is such damages as the party injured has sustained by reason of the wrongful act of the telegraph company, in violation of the statute;" and the court is therefore of opinion to affirm the judgment of the corporation court of the city of Norfolk.

LEWIS, P., dissented.

I dissent from the judgment in this case, and will briefly state the reasons which seem to me to require a reversal of the judgment of the court below.

When the dispatch in this case was delivered for transmis-

sion, at the office of the company in Norfolk, no explanation was made whatever. Its contents were purposely concealed by the employment of a cipher, and to the company's agents it was wholly unintelligible, except that the translation of the address was registered at the office and known to them. The dispatch was never transmitted; and in this action against the company to recover damages for its negligent failure to send it, the main question relates to the measure of damages.

Now, it is a familiar maxim in our jurisprudence, that "in law the immediate, not the remote, cause of any event is regarded."

The maxim has an important application in connection with the measure of damages. And the general rule upon the subject, where the action is founded in contract, as laid down by the court of exchequer in *Hadley* v. *Baxendale*, 9 Exch. 341, and since recognized by the courts of England and this country, is as follows: Where two parties have made a contract which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be such as may fairly and reasonably be considered either arising naturally, *i. e.*, according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties at the time they made the contract as the probable result of the breach of it.

This rule has uniformly been applied by the courts in telegraph cases, and the result of the decisions is, that where the import or importance of a telegraphic message is not shown, either by its own terms or by explanation to the company's agent, to whom the same is delivered for transmission, it cannot be assumed that the parties had in view any pecuniary loss as the natural or probable result of a failure to duly send and deliver such message, and in such case, in the event of a breach of the contract, the sender can recover nominal damages only, or the sum paid for sending the message. It was so ruled in the

case of *Saunders et. al.* v. *Stuart,* 1 L. R., Com. Pleas Div. 326.

In that case the defendant, whose business it was to send tele-graphic dispatches to this country and other places, negligently omitted to send an unintelligible cipher message which had been entrusted to him by the plaintiffs for transmission to New York. In an action to recover damages for the failure to send the message, a verdict was returned in favor of the plaintiffs for an amount which they would have earned if the message had been sent, as commissions upon an order to which it related. The verdict was set aside, and it was held that they were enti-tled to recover nominal damages only. In delivering the opin-ion of the court, Coleridge, C. J., said, that it was unnecessary to decide how the case would be if the message had been in plain and intelligible words. But as it was in terms which to the defendant was simple nonsense, no such damages as were awarded by the jury could be reasonably supposed to have been in the contemplation of both parties when the contract was made as the probable result of a breach of it; that it was plain that the defendant, at least, did not know, or have reason to know, what or whether any damages would result from a breach of it, and could not, therefore, be held liable for more than nominal damages.

In similar cases, where the failure to transmit or deliver a cipher or other unintelligible dispatch is the subject of contro-versy, the courts of this country have uniformly, without excep-tion and without a dissenting voice, applied the same rule. No case to the contrary is cited by the majority, and not one can be found. See *Mackay* v. *W. U. Tel. Co.,* 16 Nevada, 222; *Candee* v. *W. U. Tel. Co.,* 34 Wisc. 471; *Beaupre* v. *Tel. Co.,* 21 Minn. 155; *Landsberger* v. *Tel. Co.,* 32 Barb. 530; *U. S. Tel. Co.* v. *Gildersleve,* 29 Maryland, 232; *Behm* v. *W. U. Tel. Co.,* 8 Biss. 131; *Dorgan* v. *W. U. Tel. Co.,* 1 Amer. L. T. Rep. 409 (N. S); Sedgwick on the Mea. of Dam. (7th ed.), 122, 218, 238, 239 and cases cited.

The rule, therefore, is not only supported by authority, but is so obviously founded upon reason and justice that I am unwilling to depart from it in this case.

But it is held by the majority that a different rule is prescribed by *statute* in Virginia; and this view is based upon the provisions of section two, chapter 65, and section five, chapter 145 of the Code of 1873. I cannot concur in this construction of those statutes. To me it seems opposed to the manifest intention of the legislature, and must inevitably result in hardship and injustice to the telegraph companies doing business in this state.

The first statute (section two, chapter sixty-five of the Code,) is merely declaratory of the common law, with the additional provision prescribing a penalty of $100 for every default on the part of a telegraph company in the discharge of the duties imposed by the act. The duties thus imposed are no more than were previously imposed by the rules of the common law. From the first organization of telegraph companies, it has been held to be their duty at common law to transmit faithfully and promptly, and in the order in which they are received, all dispatches entrusted to them for transmission, and for which the proper charges are paid; and for their negligent failure to do so, apart from any statute on the subject, they are held "liable to an action for damages by any party aggrieved." This results from the nature of their business and the relations in which they stand towards the public.

It is plain, therefore, that the effect of the statute is as I have indicated, and nothing more.

The purpose of the last statute (section five, chapter 145 of the Code) is, I think, equally manifest. Its sole object is to exclude the idea, that where a specific penalty or forfeiture is prescribed for the violation of any statute, a person injured by such violation is thereby impliedly prohibited from maintaining an action to recover damages for such injury, unless a contrary intention is expressed by the legislature. It is in these words: "Any person injured by the violation of any statute may

recover from the offender such damages as he may sustain by reason of the violation, although a penalty or forfeiture for such violation be thereby imposed, unless the same be expressly mentioned to be in lieu of such damages."

Here, it will be observed, no measure of damages, or rule to be applied in ascertaining the damages sustained in such cases, is prescribed by the statute. The rules of the common law, applicable to such cases, are therefore left unchanged. It is a settled principle that a statute is not presumed to alter the common law further than the act expressly declares.

In *Arthur* v. *Bokenham*, 11 Mod. 150, Trevor, C. J., in delivering the opinion of the court said: "The general rule in the exposition of all acts of parliament is this, that in all doubtful matters, and where the expression is in general terms, they are to receive such construction as may be agreeable to the rules of the common law in cases of that nature; for statutes are not presumed to make any alteration in the common law further or otherwise than the act does expressly declare; therefore, in all general matters, the law presumes the act did not intend to make any alteration, for if the parliament had had that design, they would have expressed it in the act."

It seems to me, therefore, that the statute does not alter the common law rules which, in cases like this, have been applied by the courts of England and our sister states.

It is unnecessary to enquire whether telegraph companies are common carriers; that they cannot be so considered and treated, however, is shown by the overwhelming weight of authority. In a recent edition of a work of recognized authority, it is said, that while many of the earlier cases inclined to the doctrine that they were common carriers, and subject to the same liabilities, the whole current of decision is now the other way. Sedg. on the Measure of Damages (7th ed.) 122, note, and cases cited. See also 21 Wall. 269–70; *Saunders et. al.* v. *Stuart*, 1 L. R. Com. Pleas Div. 326.

By the decision in this case, such companies are held to a more

onerous liability than is imposed upon carriers of goods by the rules of the common law. When goods are delivered to the latter to be carried, the parties are presumed to contract with reference to the ascertained or supposed value of the goods so delivered. But in this case a telegraph company is held liable for the full amount of damage occasioned by its failure to send an unintelligible cipher dispatch, of whose import and importance it was not informed and could know nothing.

Such a doctrine, it seems to me, is not only unsupported by authority, but is opposed to reason and justice; and I am unwilling that it shall go forth as the law of this state unaccompanied by my dissent.

JUDGMENT AFFIRMED.