## HART v. WESTERN UNION TELEGRAPH CO.*

### No. 9089; September 18, 1884.

#### 4 Pac. 657.

**Telegraph Companies—Limitation of Liability.—A Stipulation** purporting to exempt a telegraph corporation from all liability for mistakes or delays in the transmission or delivery, or for nondelivery, of any unrepeated message, whether happening by negligence of its servants or otherwise, beyond the amount received for sending the same, is void for want of consideration to support it.

**Telegraph Company—Stipulation Against Liability—Presumption of Negligence.—It** is not competent for telegraph companies to stipulate against or limit their liability for mistakes happening in consequence of their own fault; such as want of proper skill or ordinary care on the part of their operators, or the use of defective instruments. They are exempt only for errors arising from causes beyond their control; and whether such error was caused by negligence or was beyond their control is a question for the jury, the presumption being that it occurred through negligence.

APPEAL from the Superior Court of San Joaquin County.

W. H. L. Barnes for appellant; Byers & Elliot for respondent.

ROSS, J.—On the fifteenth day of December, 1882, the plaintiff delivered to the defendant, at its Stockton office, this message: "George W. McNear, San Francisco: Buy bail barley falun; report by mail. George Hart." The message was promptly transmitted and delivered as written, except that the word "bail" was changed to the word "bain." By the private cipher code of McNear, used by the plaintiff in the message, the word "bail" means "one hundred tons," and the word "bain" means "two hundred and twenty-five tons." As the message was delivered, it directed McNear to buy for the account of the plaintiff two hundred and twenty-five tons of barley, whereas, as it was written by the plaintiff, McNear was directed to buy on plaintiff's account one hundred tons only.

*For subsequent opinion in bank, see Hart v. Western Union Tel. Co., 66 Cal. 579, 56 Am. Rep. 119, 6 Pac. 637.

Acting on the message received, McNear bought for plaintiff two hundred tons of barley. When the plaintiff discovered that fact he notified the defendant that one hundred tons had been bought in excess of that directed to be bought by the original message, and asked the defendant what he should do with the surplus so purchased. Defendant refused to give any instruction in regard to it. Plaintiff thereupon sold the barley at the highest market rate, his loss on the extra one hundred tons being four hundred and twenty-nine dollars and eighty-two cents. It is for the loss thus sustained by him that the action is brought.

At the trial, the only proof given by the plaintiff to show negligence on the part of the defendant was the admitted fact that the message was delivered in its altered form. It was also admitted that the message was written by the plaintiff upon a printed form prepared by the defendant, underneath the words, "Send the following message, subject to the above terms, which are hereby agreed to"; and that among the "above terms" referred to are the following: "To guard against mistakes or delays the sender of a message should order it repeated; that is, telegraphed back to the originating office for comparison. For this, one-half the regular rate is charged in addition. It is agreed between the sender of the following message and this company that said company shall not be liable for mistakes or delays in the transmission or delivery, or for nondelivery, of any unrepeated message, whether happening by negligence of its servants or otherwise, beyond the amount received for sending the same; nor for mistakes or delays in the transmission or delivery, or for nondelivery, of any repeated message, beyond fifty times the sum received for sending the same, unless specially insured; nor in any case for delays arising from unavoidable interruptions in the working of its lines, or for errors in cipher or obscure messages."

That the message in question was not "repeated" is conceded by the plaintiff. It further appears in the case that no explanation of the meaning of the dispatch was made by the plaintiff at the time he delivered it to the defendant, for which reason, and because, as is claimed, the message under consideration was in cipher, appellant contends that the measure of damages is the price paid for the transmission of the

telegram in this case—thirty cents. In support of this point it is said by counsel that "the decisions of all the courts uniformly declare that unless the importance of the message is shown, either by its own terms or by explanation made to the person receiving it in behalf of the telegraph company, no damages are recoverable for failure or delay in transmission beyond the price paid for that purpose." In this appellant's counsel is mistaken. The cases cited by him undoubtedly sustain the point he makes, and there are other cases to the same effect. Some of those decisions were based on messages which were in cipher, and others, messages which, though not in cipher, did not themselves disclose the extent or import of any transaction had in contemplation by the parties. In those cases substantial damages were refused because neither the messages nor other information given made known to the operator what was contemplated. Hence it was ruled that plaintiff could not recover of the telegraph company what, not understanding, it could not have contemplated as the effect of a miscarriage or other failure.

While not doubting the general rule that damages must be such as may be fairly supposed to have entered into the contemplation of the parties when they made the contract—that is, such as might be naturally expected to follow its violation —we do question, and think not sound, the application of that rule as made in the class of cases to which allusion is above made. Telegraph companies have conferred upon them by law certain privileges, among them the right of eminent domain, and they are charged with certain duties, among them, the obligation to send promptly and correctly such messages as are intrusted to them. Of course, if illegibly written, the operator may reject a message, but if plainly written, his duty is to send it as written. Why has he the right to know what the message refers to? In what way would such knowledge aid him in the discharge of his duty to send it correctly? "One of the great attractions," says Scott and Jarnagin. in their treatise on the law of Telegraphs, section 404, "which this mode of communication presents is the brevity of the dispatch, such abbreviations being used in many cases as will enable the person for whom it is intended alone to understand it, and hence the vast amount of business the telegraph operator is capable of transacting in the transmission and delivery

of messages. So that an explanation of the meaning, importance and bearing of each message would be an insufferable annoyance, and, in the multiplicity of messages delivered for transmission, could not be remembered, even if the time could be spared to listen to it, and it would rarely afford any benefit or advantage to the company after the information was communicated.'' Proceeding, these writers say, and say correctly, that though the company, through its agents, may not know the meaning of the particular message, they do know that messages of great value and importance, involving heavy losses in case of failure or delay or mistake in their transmission, are constantly sent over the wires; and they do know that they hold themselves out to the public as prepared at all times and for all persons to transmit messages of this description. And the rule of damages as applied to telegraph companies is there deduced, which we think the true rule, namely, that, although the message be unintelligible to the company, yet, as its undertaking was to transmit the message promptly and correctly, both parties contemplated that whatever loss should naturally, and in the usual course of things, follow a violation of that obligation, the company should be responsible for. The same conclusion was reached by the supreme court of Alabama in the case entitled Daughtry v. Amer. U. Tel. Co. [75 Ala. 168, 51 Am. Rep. 435], decided in December, 1883, a note of which will be found at page 731, 46 Am. Rep., and by the court of appeals of Virginia in the case of Western Union Tel. Co. v. Reynolds, 77 Va. 173. See, also, Rittenhouse v. Independent Line of Telegraph, 1 Daly (N. Y.), 474.

It is also contended on behalf of the defendant corporation that, as the message in question was not ''repeated,'' defendant is not responsible, under any circumstances, beyond the amount received for its transmission; and this because it is so declared in the conditions printed at the head of the form upon which the dispatch was written, and to which, as is claimed, the plaintiff assented. There are numerous cases that hold that such a rule on the part of the company is reasonable, valid and binding on the sender of the message. The cases that so hold are too numerous to be here referred to in detail. They will be found collated in a note to the case of Western Union Tel. Co. v. Blanchard, 45 Am. Rep. 486. But there are many cases to the contrary, and the latter

class we think based on the better reason. In the first place,
we agree with the supreme court of Illinois in the case of
Tyler v. Western Union Tel. Co., 60 Ill. 421, 14 Am. Rep.
38, and S. C., 74 Ill. 170, 24 Am. Rep. 279, where it is held
that the regulation requiring messages to be repeated is not
a contract binding in law, for the reason that the law im-
posed upon the company duties to be performed, for the per-
formance of which it was entitled to a compensation fixed by
itself and which the sender had no choice but to pay; that
among those duties was that of transmitting messages cor-
rectly; that the tariff paid was the consideration for the per-
formance of this duty in each particular case, and when the
charges were paid the duty of the company began, and there
was, therefore, no consideration for the supposed contract re-
quiring the sender to repeat the message at an additional cost
of fifty per cent of the original charge. To the same effect is
Bartlett v. Western Union Tel. Co., 62 Me. 218, 16 Am. Rep.
437, and Candee v. Western Union Tel. Co., 34 Wis. 477, 17
Am. Rep. 452, where the court say:

"Aside from the objections resting on grounds of public
policy, and which forbid the company from stipulating for
immunity from the consequences of its own wrongful acts,
it seems very clear to us that there can be no consideration
for such stipulation on the part of the sender of the message,
and that, so far as he is concerned, it is void for that reason,
although exacted by the company and fully assented to by
him. Either the company enters into a contract with him
and takes upon itself the burden of some sort of legal obliga-
tion to send the message or it does not. It would be mani-
festly against reason, and what all must assume to be the
intention of the parties, to say that no contract whatever is
made between them, and nobody, not even the officers or repre-
sentatives of the company, asserts such a doctrine. It would
seem utterly absurd to assert it. Holding itself out as ready
and willing and able to perform the service for whosoever
comes and pays the consideration itself had fixed and declared
to be sufficient, and actually receiving such consideration, it
cannot be denied, we think, that a legal obligation arises and
duty exists on the part of the company to transmit the mes-
sage with reasonable care and diligence, according to the re-
quest of the sender. Such being the attitude of the company,

and the obligation which it assumes by accepting the payment, the question arising is whether it can at the same time, and as a part of the very act of creating the obligation, exact and receive from the other party to the contract a release from it. The regulations under consideration, if looked upon as reasonable and valid, completely nullify the contract by absolving the company from all obligation to perform it, and the party delivering the message gets nothing in return for the price of transmission paid by him. Is it possible for the company, or for any other party entering into a contract for a valuable consideration received, to promise and not to promise, or to create and not to create, an obligation or duty at one and the same moment and by one and the same act? The inconsistency and impossibility of such things are obvious. But if there were no such difficulties, or if the occasion or circumstances were such that a valid release might be executed, and it be regarded in that light, still the objection exists that there is no consideration whatever to support it, and it must be held void on that ground. If it be urged that the sender receives his consideration in the reduced price of transmission, or because the company undertakes to send the message at one-half the usual rates of transmitting day messages, that argument ends in proving that the company does not undertake to send the message at all, and that no contract or agreement on its part is made or entered into for that purpose. If the company promises or binds itself at all for the rate or consideration named, and which it is willing to and does accept, then the smallness of such consideration cannot operate to relieve from the promise or to destroy the obligation thus created. Regarding the regulations in this light, therefore, as well as in that of correct public policy, it is seen that effect cannot be given to them as a means of protection or escape on the part of the company from all liability for the performance of its contract. The regulations cannot serve to shield the company from the consequences resulting from the gross negligence or fraud of its officers or agents, or from their entire failure to perform the service, no good excuse for such failure being offered or shown.''

We therefore hold that the stipulation purporting to exempt the corporation defendant from all liability for mistakes or delays in the transmission or delivery or for nondelivery of

any unrepeated message, whether happening by negligence of its servants or otherwise, beyond the amount received for sending the same, is void for want of a consideration to support it. And further, that it is not competent for telegraph companies to stipulate against or limit their liability for mistakes happening in consequence of their own fault, such as want of proper skill or ordinary care on the part of their operators or the use of defective instruments: See authorities above cited, and Sweatland v. Ill. & Miss. Tel. Co., 27 Iowa, 433, 1 Am. Rep. 285; Wolf v. Western Union Tel. Co., 62 Pa. 83, 1 Am. Rep. 387; Breese v. U. S. T. Co., 48 N. Y. 132, 8 Am. Rep. 526; U. S. Tel. Co. v. Gildersleeve, 29 Md. 232, 96 Am. Dec. 519; Western Union Tel. Co. v. Buchanan, 35 Ind. 429, 9 Am. Rep. 744; Hibbard v. Western Union Tel. Co., 33 Wis. 558, 14 Am. Rep. 775; Tel. Co. v. Griswold, 37 Ohio St. 301, 41 Am. Rep. 500. We think the true rule is that such companies are exempt only for errors arising from causes beyond their own control. And this would seem to be the rule adopted by statute in this state; for by section 2162 of the Civil Code it is declared: ''A carrier of messages for reward must use great care and diligence in the transmission and delivery of messages. A carrier by telegraph must use the utmost diligence therein.''

We are further of opinion that, the plaintiff having proved the mistake in the message as delivered, the onus was upon the defendant to show how it occurred: Tyler v. Western Union Tel. Co., supra. If the error was caused by atmospheric disturbances, or a momentary displacement of the wires, the defendant knew it, and ought to show it. This, defendant undertook to do on the trial in the court below. There was testimony given tending to show that before and at the time the message in question was sent, trouble was experienced in the transmission of dispatches, owing to the condition of the weather; that it was foggy and stormy. It was further made to appear that in the telegraphic code the following lines and dots, when transmitted along the wire, made the word ''bail'':

— - - -        - —        - -        —

And that the word ''bain'' is expressed by the following:

— - - -        - —        - -        —- -

There was also testimony tending to show that the operators at Stockton and San Francisco were competent, and that

the one at San Francisco was especially careful in the matter of this dispatch. The latter testified that she took particular pains with the message in question, ''as is shown by the mark under one of the cipher words,—the last word—because it was an unusual word—'falun.' I asked Mr. Dixon to repeat it, and I put a little mark, '+,' under it to show that it was repeated. The other words, being ordinary words, I paid no attention to, because it is something very likely to be received in any message.'' There was also given on behalf of the defendant further testimony tending to show that the error resulting in the change of the word ''bail'' to ''bain'' was caused by a break in the electric current, and that this in turn was caused by atmospheric influences prevailing at the time, and, of course, beyond the control of defendant. If such was the fact, the verdict should have been for the defendant. But it was a question of fact for the jury, under appropriate instructions from the court. The court should have told the jury that the mistake in the message as delivered, being admitted, the presumption was that it occurred through the negligence of defendant; but that if they believed from the evidence that the mistake occurred through a cause or causes beyond defendant's control, such as a break in the electric current produced by atmospheric influences, their verdict should be for the defendant. We think this question, which was the turning one in the case, was not fairly submitted to the jury in the court below, and we must therefore remand the cause for a new trial.

Judgment and order reversed and cause remanded for a new trial.

We concur: McKinstry, J.; McKee, J.